John WILLIAM, Petitioner,

v.

Harold NYE, et al., Respondents.

No. 93–3234–DES.

United States District Court,
D. Kansas.

Nov. 7, 1994.

John William, pro se.

Jean M. Schmidt, Office of the Atty. Gen., Topeka, KS, for respondents.

### MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

This matter is before the court on a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner is serving a life sentence following his conviction on one count of first degree murder in the District Court of Douglas County, Kansas, and is presently confined at the Larned Correctional Mental Health Facility, Larned, Kansas. In this action, petitioner challenges his confinement on the grounds (1) an allegedly involuntary confession was admitted in violation of his right to due process; (2) statements made by petitioner in the absence of *Miranda* warnings while he was allegedly in custody were admitted in violation of his privilege against self-incrimination; and (3) he was improperly subjected to criminal process while incompetent to stand trial.

Respondents have filed an Answer and Return, and this matter is now ripe for review. Having examined the record, the court makes the following findings and order.

*Factual and Procedural Background*

Richard Settlemyre, a nine-year-old boy, was last seen alive on a fishing trip with petitioner on July 12, 1988. On that day, Richard's father gave him permission to go with petitioner, then a 29–year–old homeless transient with a nearly lifelong history of mental illness. Petitioner was well-acquainted with the Settlemyre family and had accompanied them on occasional family outings and visited in their home. Petitioner usually stayed in a campsite under the Kansas Turnpike bridge on the west bank of the Kansas River, near Lawrence, Kansas, and he frequently fished there with the Settlemyre children.

Richard did not return home at the agreed time on the evening of July 12, and his mother and older brother, who had been out of town, looked for him along the river on July 13 with no success. Mrs. Settlemyre reported her son's absence to the Lawrence Police Department on the morning of July 14, 1988.

The police department launched a search for Richard upon receipt of this report, and Detectives Davis and Haller located petitioner walking near the river at approximately 10:30 on the morning of July 14. Davis called out to petitioner, who readily came toward him. Davis told petitioner Richard was missing, and petitioner stated he had walked Richard home around 7:00 on the evening of July 12. Petitioner then accompanied the officers to areas he identified as places he and Richard had fished and dug worms, and he showed the officers the way he had walked Richard home after their last fishing trip.

At about 12:00 p.m., the detectives took petitioner to the Douglas County Law Enforcement Center for an interview, stopping on the way to allow petitioner to buy food at a convenience store. The detectives waited

in the car while petitioner entered the store and made his purchase.

The officers continued to talk to petitioner at the Law Enforcement Center concerning the fishing trip on July 12 and his activities that day. Petitioner was given food at about 2:00 p.m. At about 2:45, petitioner and the detectives left the Law Enforcement Center to look in other places Richard might have gone. They returned to the Center after approximately an hour, and petitioner was interviewed by Detective Haller alone for about one hour after that. Petitioner was allowed to use the restroom at about 5:00, and the interview resumed.

Detective Davis learned that a body had been found in the Kansas River at approximately 6:50 that evening,[1] and he went to interview room a short time later and read petitioner his *Miranda* rights. Petitioner stated he understood his rights, and then stated he was willing to talk to the officers. Petitioner, in response to questions from Davis, stated he could read and write and that he had completed the 10th or 11th grade.

The officers continued to question petitioner, and he was provided with cigarettes at about 7:20 and food at 8:00. Petitioner stated that if "this thing didn't get cleared up at some time in the future, he might have to get an attorney to help him get it cleared up." (R. III, V. XI, p. 235.) Davis then asked petitioner if he wanted an attorney, and petitioner responded that he did not. Detective Haller then returned to the room, and again asked petitioner if he wanted an attorney, which petitioner again declined.

The interview continued, and petitioner brought up a variety of topics unrelated to the investigation. The officers pressed petitioner concerning the accuracy of his statements, and at one point, Detective Davis specifically asked petitioner if he were homosexual. Petitioner responded, "You are trying to say I raped and mutilized [sic] him." (R. III, Vol. XI, p. 237.) At this point, petitioner had not received any information

from the officers concerning the condition of the body.

During the evening, Captain Malson joined the interview. At approximately 2:30 a.m., Detective Davis obtained a search warrant to perform a sexual assault kit on petitioner. During this period, petitioner described seeing a unknown black man decapitate Richard, and then gave a version of Richard's death in which the child died while swimming in the river. In the latter version petitioner described dismembering Richard to bury him more easily. Petitioner stated the clothing he wore on July 12 had been picked up by a woman who regularly retrieved his clothing and returned it laundered, and when asked where Richard's clothing was, responded, "Richard was born naked and died naked." (R. III, Vol. XI, p. 246.)

At approximately 4:00 a.m., Malson and Davis took petitioner to Lawrence Memorial Hospital for execution of the search warrant. Following the administration of the sexual assault kit, petitioner was taken to a smoking area of the hospital. While there, petitioner told Sergeant Harmon of the Lawrence Police Department that Richard had drowned. When Harmon responded that this could be confirmed by an autopsy, petitioner said, "Okay, I killed him." (R. III, Vol. XI, p. 308.) Petitioner then gave Harmon a version of the crime in which he had gone "berserk" and killed Richard, after a two-year struggle against a desire for sexual activity with the boy. Petitioner then stated he wondered what an attorney could do for him, and Harmon, after asking if petitioner wanted an attorney and receiving an affirmative response, directed that questioning stop. Petitioner was placed under arrest at approximately 5:30 a.m. on July 15.

Later on the morning of July 15, petitioner began pounding on the walls of his cell and demanded to talk to someone. Jailer Albert Deathe responded, and talked to petitioner both that day and on the next, again at petitioner's request. During these conversations, petitioner told Deathe details of the crime and stated he did not understand his

---

1. The body, which had been dismembered and mutilated, was not immediately identifiable but was later identified as Richard's body.

behavior. Deathe later testified petitioner was very agitated during these conversations and that he did not ask petitioner for information except for clarification when he could not understand petitioner's statements.

Defense counsel sought suppression of all petitioner's statements to police. After a hearing on the matter, the trial court found petitioner was not in custody prior to the time he was given *Miranda* warnings, and concluded that at the time it became apparent a crime had been committed and suspicion focused on petitioner, he was given appropriate warnings. The trial court also found neither the actions of the police nor petitioner's mental state rendered him unable to make voluntary, intelligent choices concerning his own statements. The trial court therefore refused to suppress petitioner's confessions.

Petitioner's competency to stand trial was in issue from the beginning of proceedings against him. Due to the complexity of the series of professional evaluations and hearings concerning this point, the relevant facts are set forth in the discussion of that issue.

### Discussion

*Voluntariness of the confession*

■ The use of an involuntary confession violates the defendant's right to due process secured by the Fourteenth Amendment as well as the Fifth Amendment privilege against self-incrimination. *Colorado v. Connelly,* 479 U.S. 157, 163, 107 S.Ct. 515, 519, 93 L.Ed.2d 473 (1986).

■ The voluntariness of a confession is determined by a review of the totality of the circumstances surrounding the confession. *United States v. Muniz,* 1 F.3d 1018 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 575, 126 L.Ed.2d 474 (1993). Relevant to this issue are the age, education, and intelligence of the accused, and the conduct of law enforcement officials, such as the length and location of the questioning and the use of physical punishment. *Id.*

■ While the mental condition of a confessant is relevant, it is not determinative. Rather, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'". *Connelly,* 479 U.S. at 167, 107 S.Ct. at 522.

The Kansas Supreme Court found the facts of petitioner's case did not demonstrate police coercion, noting much of the time William spent with members of the Lawrence Police Department on July 14 was spent looking for Richard, that interviews conducted at the Law Enforcement Center were neither lengthy nor continuous, and that the questioning was fair and noncoercive. The Kansas Supreme Court also found that despite petitioner's mental condition, there was no showing that he was "unusually susceptible" to police questioning and that he remained responsive throughout the questioning. *State v. William,* 248 Kan. 389, 807 P.2d 1292, 1308, *cert. denied,* 502 U.S. 837, 112 S.Ct. 120, 116 L.Ed.2d 89 (1991).

■ In reviewing a claim for habeas corpus relief on the ground of an unlawfully obtained confession, this court must make an independent finding of whether, under the totality of the circumstances, the confession was obtained in a lawful manner. *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985). However, the court is bound by the statutory mandate that the factual findings of the state courts enjoy a presumption of correctness [2] in evaluating the "[e]xplicit and implicit [factual] findings by state trial and appellate courts". *Case v. Mondragon,* 887 F.2d 1388, 1392 (10th Cir. 1989), *cert. denied,* 494 U.S. 1035, 110 S.Ct. 1490, 108 L.Ed.2d 626 (1990). The "subsidiary factual question" of whether "police have engaged in the intimidation tactics alleged" is likewise afforded the presumption of correctness. *Miller,* 474 U.S. at 112, 106 S.Ct. at 450.

---

**2.** The federal habeas corpus statute governing review of state court judgments provides:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue ... shall be presumed to be correct. 28 U.S.C. § 2254(d).

■ The record before the court shows the petitioner was alert and oriented throughout the time he was questioned by police and that he was able to communicate in a reasonable manner. Petitioner told police he was able to read and write and that he had completed the 10th or 11th grade, and at the time the questioning of petitioner began, the police had only limited knowledge of his background.

While the roughly 19 hour period petitioner spent with police is somewhat troubling, it must be noted that the investigation of Richard's disappearance was unfolding rapidly during this time, and that at least the first few hours of petitioner's presence with police were spent establishing Richard's habits and retracing the events of July 12, when he was last seen alive. During this time, petitioner was engaged in showing police areas frequented by Richard, and the petitioner was provided food and cigarettes at intervals and permitted breaks. While it is true petitioner was not advised he was free to leave, it is likewise true he did not ask to do so or to contact anyone else, such as a friend or family member. Finally, there is an absence of any evidence of coercive behavior by police. Petitioner was not subjected to threats or physical abuse, and officers were cognizant of his rights, stopping the questioning when it reasonably appeared petitioner desired to seek counsel.

For these reasons, the court agrees petitioner's confession was voluntary.

*Statements made prior to Miranda warnings*

■ Petitioner next asserts the Kansas Supreme Court improperly determined he was not "in custody" for *Miranda* purposes and deprived him of his right against self-incrimination by admitting statements made by him to the police.

"An officer's obligation to administer *Miranda* warnings attaches ... 'only where there has been such a restriction on a person's freedom so as to render him "in custody."'" *Stansbury v. California,* —— U.S. ——, ——, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). To determine whether an individual is in custody, "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [has been] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Id.* —— U.S. at —— ——, 114 S.Ct. at 1528–29 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)). The inquiry is objective and does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned ... [A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda.*" *Id.,* —— S.Ct. at —— ——, 114 S.Ct. at 1529–30.

In this case, petitioner was in the company of law enforcement officers for several hours. During this period, he voluntarily accompanied officers to areas near the river in search of the missing child and was questioned at the Law Enforcement Center. Petitioner was never in restraints, nor was he told that he could not leave. Because the questioning occurred at the Law Enforcement Center, it was reasonable for an officer to escort petitioner to the restroom, rather than allowing him to move unsupervised through the building.

Under these circumstances, the court finds none of the restraints which might typically occur incident to an arrest and concludes the state courts reasonably determined petitioner was not in custody so as to require the administration of *Miranda* warnings to petitioner. Therefore, petitioner is not entitled to habeas relief on this ground.

*Competence to stand trial*

In Ground III of his petition, petitioner asserts he was erroneously found competent to stand trial, resulting in a deprivation of due process.

1. Procedural and factual background

The initial hearing to determine petitioner's competency was conducted on August 12, 1988. At that time, the trial court considered a report from a psychologist at the Bert

Nash Community Mental Health Center, Lawrence, Kansas, which was prepared after a battery of standardized tests and a clinical interview with petitioner. The report concluded petitioner was not competent to stand trial and described him as fluctuating between two mental states, one of which permitted him sufficient contact with reality not only to comprehend the criminal charges against him but to assist his attorneys adequately in presenting a defense, and the other which prevented him from thinking in a sequential, logical manner, although he remained oriented and not grossly psychotic. Because of the impairment to petitioner's thought processes in the latter state, the psychologist recommended petitioner be transferred to Larned State Hospital for treatment which might enable him to maintain a mental state sufficient to stand trial. The trial court adopted this recommendation, found petitioner incompetent, and sent him to the Larned State Hospital for treatment. He was admitted there on August 22, 1988.

A second competency hearing was conducted on November 23, 1988. At that hearing, the court considered the testimony of a speech pathologist who had evaluated petitioner concerning his severe difficulty in communicating. Petitioner's defense counsel advised the court at the hearing he felt petitioner was unable to assist with his defense, and the trial court also received three reports concerning petitioner's psychiatric condition.

Following the hearing, the trial court found petitioner competent to stand trial. On March 9, 1989, though, petitioner was found incompetent following a subsequent hearing and was returned to Larned.

The final competency hearing was conducted on October 31, 1989. At this hearing, the trial court heard testimony from two psychologists from the Larned Security Hospital, Dr. Charles Befort and Robert Huerter. The testimony of these witnesses was essentially that while petitioner had serious emotional problems and a borderline I.Q., he had the ability to reason and was competent to stand trial.

Dr. Befort's testimony was based on twelve to fifteen hours of sessions or interviews with petitioner and over twenty hours of reviewing records and notes concerning him. Dr. Befort also had nearly daily contact with petitioner during his stay at Larned. In his opinion, petitioner met the appropriate competency criteria and was able to assist in his defense and understand the purpose of the court proceedings. Dr. Befort also testified petitioner's emotional and mental problems did not prevent him from functioning as a defendant, but he acknowledged that it would be difficult for petitioner's attorneys to work with him and that petitioner steadfastly refused to accept a defense approach which did not encompass the bizarre scenario he expressed to explain the crime.

Mr. Huerter was permitted to give a lay opinion that petitioner was functioning in the borderline range of intellectual ability and was able to communicate with his attorneys in preparing a defense. Huerter also related petitioner had told him, "I had to play the nut role or they would have sent me to prison." (R. III, Vol. VIII, p. 54.)

Two psychiatrists from Larned also testified at the hearing. The first, Dr. J.L.L. Fernando, testified that while petitioner was competent, this state was fragile. He noted that petitioner did not appear to suffer from hallucinations or delusions and testified that, although petitioner tended to deviate from one subject to another, he could communicate effectively with his attorneys if he desired to do so.

The second psychiatrist, Dr. Anthony Troiano, testified that petitioner was not schizophrenic or delusional, although he held beliefs that were bizarre, such as his belief that a cult in Lawrence had caused all the murders in that city since 1987. He testified petitioner's beliefs did not constitute a structured delusional system but stemmed from his immaturity and a desire for self-protection. Dr. Troiano, who had daily contact with petitioner over a six-month period, concluded petitioner was competent to stand trial.

The defense presented the testimony of Dr. Herbert Modlin, a psychiatrist from the Menninger Clinic, Topeka, Kansas. Dr.

Modlin examined petitioner in March 1989 and found him incompetent, and saw him for approximately 45 minutes on the day before the October 31, 1989, competency hearing. Dr. Modlin viewed petitioner as being in generally good contact with reality until he began to discuss his version of the crime. He testified he was uncertain whether petitioner was competent to assist his attorneys in presenting a defense, noting petitioner had a good relationship with at least one of his attorneys but rejected any suggestion of an insanity plea or the possibility of a plea bargain. Dr. Modlin believed petitioner's delusional system had become more inflexible with time and found he responded relevantly within that frame of reference.

A clinical psychologist, Dr. Robert Schulman, also testified for the defense and described petitioner as a paranoid schizophrenic with a structured delusional system. This witness believed petitioner was not competent to stand trial, primarily due to his entrenched delusional system.

The defense also presented testimony from two experienced defense attorneys who saw petitioner briefly and a speech and language pathologist who evaluated petitioner on two occasions. Each attorney described difficulty in communicating with petitioner on topics concerning the trial beyond a superficial explanation of the court proceedings. The speech pathologist described petitioner as having a total language age of eight.

After taking the matter under advisement, the trial court concluded petitioner was competent to stand trial, and the trial commenced on November 7, 1989. Shortly after the proceedings began, petitioner refused to leave his cell in a dispute over the use of restraints. Defense counsel sought another competency evaluation, and the trial judge took the unusual step of talking to petitioner in his cell to determine whether the proceedings should continue. After doing this, the trial judge found petitioner was competent, and the matter proceeded.

### 2. Legal standards

■ Competency is an issue of fact subject to the presumption of correctness in 28 U.S.C. § 2254. *Maggio v. Fulford,* 462 U.S. 111, 117, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794 (1983); *Lafferty v. Cook,* 949 F.2d 1546, 1549 (10th Cir.1991) (citing *Demosthenes v. Baal,* 495 U.S. 731, 734–36, 110 S.Ct. 2223, 2225, 109 L.Ed.2d 762 (1990)).

■ Under *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), the legal test for competency requires that a district judge find not only that the defendant is oriented in time and place with some awareness and memory of the events, but that "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and ... a rational as well as factual understanding of the proceedings against him." *Id.,* 362 U.S. at 409, 80 S.Ct. at 789.

In the Tenth Circuit, the appropriate inquiry of the habeas court on the issue of competency "is whether the defendant's mental condition, however it may be labeled and whatever symptoms it may produce, prevents the defendant from having a rational or factual understanding of the proceedings against him or significantly prevents the defendant from consulting with his lawyer." *Lafferty,* 949 F.2d at 1551 n. 3. In addition, where a competency hearing was conducted by the trial court, "the issue on habeas review is whether the state court's competency finding, assuming that the determination was made under the proper standard, is entitled to a presumption of correctness ... [W]hen doing so [the habeas court must] consider that part of the record of the state proceeding upon which the determination was made...." *Id.* at 1555 n. 10.

### 3. Application

■ Under *Lafferty,* the court's inquiry begins with a determination whether the state court applied the proper standard in evaluating competency. Here, the trial judge found that the only issue on the competency question was whether petitioner could assist in making his defense and concluded that the evidence, when viewed as a whole, demonstrated petitioner understood the nature and purpose of the trial proceedings. After weighing the evidence, the court found more persuasive the opinion offered by

mental health professionals from the Larned Security Hospital, given their opportunity to observe and treat the petitioner over a period of time. The trial court acknowledged the general agreement of all the witnesses that petitioner would have difficulty in conferring with his counsel, but found him to be borderline competent.

The court finds the trial court applied the appropriate standard of whether petitioner's mental condition would significantly interfere with his communication with his attorneys.

The second part of the inquiry prescribed by *Lafferty* requires this court to examine whether the state court's findings are entitled to a presumption of correctness. In this matter, the trial court had both the opportunity to consider the opinions offered by numerous mental health professionals and the opportunity for considerable observation of petitioner during the course of the proceedings through his competency hearing in October 1989.

Having reviewed the record carefully, this court is persuaded the trial court's decision is a reasonable one, if perhaps not the only tenable result from the testimony presented. It is apparent the trial court was faced with the extremely close case of a criminal defendant whose mental condition presented severe intellectual limitations and whose emotional and cognitive immaturity presented particular concerns. There can be no doubt petitioner's defense attorneys had few options, given their client's absolute refusal to consider any defense strategy at variance with his own highly improbable explanation of the crime. Despite these concerns, however, the record of the competency hearing discloses numerous professional opinions that the petitioner had attained a state which enabled him to communicate effectively with his attorneys and to comprehend their recommendations. Therefore, this court concludes the trial court's determination is supported by the record and is entitled to the presumption of correctness.

IT IS THEREFORE ORDERED the petition for habeas corpus is denied.