1998-NMSC-048

972 P.2d 847

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Alex MUNOZ, Defendant–Appellant.**

No. 24,015.

Supreme Court of New Mexico.

Nov. 24, 1998.

William J. Friedman, Santa Fe, for Appellant.

Tom Udall, Attorney General, M. Victoria Wilson, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

McKINNON, J.

{1} Defendant Alex Munoz appeals his conviction for first-degree murder for the stabbing death of James Rogers. He asserts that his right to due process under the Fourteenth Amendment and his right against compelled self-incrimination under the Fifth Amendment were violated by the admission of a coerced confession obtained without his being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also asserts that the jury was improperly instructed on the cause of death, that there was insufficient evidence that his admitted act of stabbing the victim was a cause of death, and that there was insufficient evidence that the killing took place in New Mexico. We hold that various specific factors, if they influenced Defendant's confession, did not render it involuntary. We also hold that because Defen-

dant's freedom of action at the time of the confession was not curtailed in a way that could be associated with a formal arrest, he was not denied his right to be free from self-incrimination. Finally, we affirm the trial court as to the remainder of Defendant's claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

{2} On or about May 15, 1994, Defendant was at a party in El Paso, Texas, and saw his friend get into a fight, apparently involving the victim. Later that night, Defendant, the victim, and others went to a remote area on a military installation where the victim was beaten, stabbed, and killed. Defendant's confession, obtained the following year, is important in analyzing several issues raised on appeal. We therefore discuss at length the circumstances in which Defendant gave the confession.

{3} At 9:50 a.m. on February 17, 1995, Larry Houpt and Carlos Conejo, special agents for the Federal Bureau of Investigation (FBI), approached Defendant's grandparents' house, where Defendant lived. When Defendant's grandfather answered the door, the agents identified themselves and told him they wanted to speak with Defendant about the death of a young man. Defendant's grandfather asked if they were referring to "the one in the desert," which surprised Houpt. Houpt replied that that was the death they were investigating and the grandfather left to get Defendant. Several minutes later, Defendant appeared at the door, looking somewhat tired, yawning and stretching. Houpt and Conejo introduced themselves to Defendant and told him they wanted to talk with him about the death of James Rogers, but away from his home. He left to put some shoes on and returned to the door.

{4} Defendant testified that he was scared and did not want to go with the FBI agents, but he went with them because his grandfather told him that he must go. His grandfather told him that he had to listen to his grandfather because he lived in his home. Defendant's grandfather strongly urged him

to go with the FBI agents and told him not to worry about it.

{5} After they left the home, but before they entered the car, Houpt told Defendant that he did not have to go with them, that he did not have to talk to them, that he was not under arrest, that he would be free to leave at any time, and that they would bring him back to his house after the interview. Houpt did not advise Defendant that he could have an attorney present during the interview. Defendant said that he didn't mind talking with the agents. He consented to being interviewed and expressed no objection to it. Houpt told Defendant he did not have to talk to them and did not have to go with them to make clear to Defendant that he was not in custody.

{6} They drove to an empty parking lot a few minutes' driving time from Defendant's residence. Houpt and Conejo had decided prior to arriving at Defendant's residence that they would conduct the interview away from the home, that they would not arrest Defendant prior to interviewing him about Rogers' murder, and that they would conduct the interview only on a voluntary basis.

{7} Houpt led the interview, though Conejo interjected questions from time to time. Pursuant to FBI policy, Houpt was seated in the back seat with Defendant while Conejo sat in the front seat of the car. Houpt explained that if Defendant were to become violent, the agents might be endangered if both were seated in the front seat. Defendant testified that he did not feel free to go because one of the agents was in the back seat with him.

{8} Houpt told Defendant that he knew the essential facts about what happened the night James Rogers was killed and that Defendant should not waste his and Conejo's time by lying to them. At that point, Defendant proceeded to tell his story in narrative form, with Houpt and Conejo periodically interjecting with questions of clarification. According to Houpt, he never raised his voice during the interview. Defendant testified, however, that Houpt raised his voice and that Houpt and Conejo primarily told the story of what happened and he interjected to fill in what he knew.

{9} Defendant testified that he was still intoxicated from the previous evening, when he drank alcohol and smoked marijuana. Defendant testified that he had a memory deficit that he attributed to his years of abuse of spray paint, pills, and other drugs. Defendant testified that he had a fear of detectives and police officers because a detective beat him up once after he and the detective's son had gotten into a fight. Houpt testified that he did not know about this incident or Defendant's fear of law enforcement. Houpt testified that, although Defendant appeared tired when he came to the door, he was alert and "calm and laid back" during the interview. Houpt did not detect an odor of alcohol, or any other odor or physical appearance that would indicate that Defendant was under the influence of alcohol, marijuana, or any other drug.

{10} Defendant testified that he was scared and intimidated by the location of the interview in the parking lot away from his home. Houpt testified that it was standard procedure and, in his experience, good practice to conduct an interview about a matter as serious as an apparent homicide away from a private residence, where the telephone, television, and visitors might interrupt the interview at a critical juncture. Furthermore, in Houpt's experience, a private residence is not an appropriate location for a solemn interview about such a serious matter.

{11} At the conclusion of the interview, Houpt drafted a three-page hand-written statement. Defendant read the statement, made several corrections and additions to it, initialed the top of the first two pages, and signed the last page. The statement recited the fact that it was being made freely and voluntarily, that Defendant knew he was free to leave and that no threats or promises had been made. He then stated that a group of people went to the desert, that the victim was beaten, and ultimately that he, Defendant, "stabbed the guy's neck a couple of times." He made sure the victim was dead, then moved the body under a bush and kicked dirt on it.

{12} Defendant testified that he read only the parts of the statement surrounding the corrections which he made and initialed. He claimed that he did not "really" read it; but that he only read it for proofreading purposes because Houpt had told him there were some errors that he wanted Defendant to correct. Defendant asserts that he had no idea what the statement was about, only that he was told to sign it and did so. He testified that he was not aware that he was making a confession by signing the statement. Defendant testified that the agents told him that signing the statement would help him out and that he need not worry. He signed the statement based on this implied promise.

{13} Houpt testified that he took notes during the interview and that immediately after the interview, he told Defendant that he was going to prepare a statement based on the interview and Houpt's notes. He asked Defendant to read, correct, and sign the statement. He then prepared the statement while Defendant was seated next to him. Houpt testified that there was casual conversation while Houpt prepared the statement. After Houpt completed the statement, he told Defendant that he had deliberately made a few errors and wanted Defendant to spot them and correct them. He asked Defendant to read the statement, and initial any corrections or additions Defendant felt were necessary. He wanted Defendant to initial the top of each page and to read the statement aloud. Defendant read the statement, initialed at the top of each page, filled in a blank on the first page indicating that he had completed the twelfth grade, made seven corrections or additions, initialed each of them, read the statement aloud, and signed the statement. Houpt and Conejo also signed the statement as witnesses. One of the errors Defendant corrected was inadvertent.

{14} Houpt explained that he follows a practice of deliberately making at least one mistake per page and asking the interviewee to spot and correct these errors. He does this to ensure that the interviewee understands and comprehends the English language and is knowingly and intelligently confessing to the content of the written statement. He testified that it is standard FBI procedure to take notes during the interview, and immediately draft a written statement to be reviewed, corrected, and signed by the interviewee.

{15} After Defendant had made his statement orally, Houpt told Defendant that they did not know what would happen. They asked him to keep the interview confidential because there were other witnesses they wanted to interview. They drove Defendant home. Defendant was surprised that they had taken him back home; he thought they were going to place him under arrest. The statement was admitted into evidence at trial.

{16} On December 6, 1995, the grand jury indicted Defendant for first-degree murder (deliberate intention), conspiracy to commit first-degree murder, and evidence tampering. Defendant moved to suppress the confession, arguing that it violated his state and federal constitutional rights. The trial court held a hearing, at which Defendant and Houpt testified. The trial court issued findings of fact and conclusions of law and denied the motion. Prior to trial, the State dismissed the evidence-tampering charge.

{17} A forensic pathologist testified at a jury trial. The jury convicted Defendant of first-degree murder and conspiracy to commit first-degree murder. The trial court sentenced Defendant to life imprisonment, with eligibility for parole after thirty years.

## II. DISCUSSION.

{18} Defendant urges this Court to reverse his conviction because (1) the admission of the confession violated his Fourteenth Amendment right to due process and his Fifth Amendment right against compelled self-incrimination, and (2) it was fundamental error for the trial court not to instruct the jury regarding the definition of cause of death. He also contends that the first-degree murder charge should be dismissed because the evidence adduced at trial is insufficient to establish beyond a reasonable doubt either that he caused the death of Rogers or that Rogers was killed in New Mexico.

540

## A. THE CONFESSION.

{19} The trial court ruled that the confession was voluntary, based on findings that Defendant was not under the influence of alcohol or drugs when he signed the confession, that he had a high school diploma, that he was almost nineteen years old at the time of the interview, and that his will was not overborne. The trial court also ruled that the agents were not required to advise Defendant of his *Miranda* rights because Defendant was neither in custody nor deprived of his freedom of movement in any significant way.

### 1. DUE PROCESS.

{20} The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.[1] Federal courts have held that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned" under this clause. *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). If a defendant's "will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

{21} Voluntariness means "freedom from official coercion." *Miller v. Dugger,* 838 F.2d 1530, 1538 (11th Cir.1988). It is determined "by an assessment of the totality of circumstances, but that assessment must include an element of official overreaching to warrant a conclusion that a confession is involuntary." *Miller,* 838 F.2d at 1536. Coercive police activity "is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amend-

ment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). For the confession to be involuntary, there must be an "essential link between coercive activity of the State ... and a resulting confession by a defendant." *Id.* at 165, 107 S.Ct. 515. Therefore, if the confession is "the product of an essentially free and unconstrained choice by its maker," that is "if he has willed to confess, it may be used against him." *Culombe,* 367 U.S. at 602, 81 S.Ct. 1860.

{22} Defendant argues that the trial court erred in admitting his confession because the State failed to prove by a preponderance of the evidence that the confession was voluntary. *See Aguilar v. State,* 106 N.M. 798, 800, 751 P.2d 178, 180 (1988). The State maintains that Defendant's due process rights were not violated because there was no overreaching or coercive tactics by the FBI agents who questioned Defendant.

{23} "On appeal, we review the totality of the circumstances to determine independently whether the prosecution has proved that a confession was given voluntarily." *State v. Setser,* 1997–NMSC–004, ¶ 8, 122 N.M. 794, 932 P.2d 484. The confession was properly admitted into evidence, and the jury was properly instructed to find whether the statement was given voluntarily, only if we determine as a threshold matter of law that the prosecution proved voluntariness by a preponderance of the evidence. *Id.* ¶ 9. The Fourteenth Amendment right to due process (and the Fifth Amendment right against self-incrimination) prohibit the admission "of a confession elicited through intimidation, coercion, deception, assurances, or other police misconduct that constitutes overreaching." *Id.* The use of any such tactics, which bear on the free will of the defendant, requires that the confession be excluded.

{24} We first review the record to determine which factors are relevant circum-

---

1. We rely solely on federal constitutional jurisprudence pertaining to this issue and do not address whether Article II, Section 18 of the New Mexico Constitution provides more protection than the Fourteenth Amendment in the context of allegedly coerced confessions because Defendant does not assert that Article II, Section 18 should be interpreted more broadly than the Fourteenth Amendment. *See State v. Gomez,* 1997–NMSC–006, ¶¶ 16–23, 122 N.M. 777, 782–84, 932 P.2d 1.

stances in this case. Defendant argues that the following six factors, when viewed together and as a totality, indicate that his confession was not voluntary within the meaning of the Fourteenth Amendment: (1) the interrogation took place shortly after he was awakened in an intoxicated state; (2) he agreed to talk to the agents only because he had a fear of detectives; (3) he was only eighteen years old at the time of the interview; (4) one agent sat with him in the back seat of an unmarked FBI car in a secluded area; (5) the agents implicitly promised leniency if he would confess; and (6) the interrogation lasted approximately 100 minutes. We agree with Defendant that these factors cannot be considered in isolation from one another. Voluntariness is determined by the totality of the circumstances, not by a number of independent tests of voluntariness. In reviewing the facts on which Defendant relies, we conclude that some lack a factual basis in the record.

{25} Defendant's claim that he was in an intoxicated state at the time of the interrogation has no support in the factual record. As the trial court found, it is unlikely that Defendant could have participated coherently in the corrections and additions to the written statement had he been intoxicated. Defendant was not uncooperative or disassociative but, according to the uncontradicted testimony of Houpt, appeared "calm and laid back" during the interview. Defendant had apparently been sleeping, or looked as if he had just been awakened, and Houpt did not smell alcohol or perceive anything to indicate that Defendant's mental state was impaired.

{26} Defendant asserts a special fear of detectives based on the fact that he had previously been beaten up by a detective with whose son he had had an altercation. Defendant's assertion is entirely subjective and there is nothing else put forth, such as a mode of reaction or a refusal to cooperate, to suggest that the FBI agents should have known that this particular suspect should be treated according to a heightened apprehension of police in a questioning in a murder investigation. Thus there was no opportunity for misconduct.

{27} As to Defendant's age, an eighteen-year-old (Defendant was two months away from his nineteenth birthday) is considered an adult for most purposes, see State v. Aguirre, 91 N.M. 672, 673, 579 P.2d 798, 799 (Ct.App.1978), and Defendant had graduated from high school and was indeed planning to attend college. The additions and corrections he made to the confession would seem to be the acts of someone who could appreciate the accuracy of a factual statement and who could comprehend the language being spoken.

{28} Defendant claims that the place or atmosphere of the interrogation contributed significantly to an overreaching by the FBI agents. He says he was "intentionally taken from his home, removed from family, [and] placed in 'quarters' that are as coercive as the police may make them without an overtly forcible detainer." Defendant also asserts that he "did not believe he could leave and thought he might get beat up." Defendant contends that he "was subject to police coercion, overreaching and misconduct sufficient to deny him due process of law."

{29} The State asserts that the interview was not in a secluded area. The parking lot was less than a mile from Defendant's residence. Defendant described it as being "right by where I live." He described the drive from his residence to the parking lot as "real quick." Adjacent to the parking lot was a busy thoroughfare. Defendant testified that he could see cars driving by on that street from the car during the interview.

{30} Houpt explained that they decided to conduct the interview away from the home to be free from distractions that might arise from the telephone, television, or visitors. He also testified that it is standard FBI procedure to seat one agent in the back with a suspect. If the suspect should become violent, it would be unsafe for both agents to be seated in front, with their backs to the suspect.

{31} Defendant claims that he was taken from his home. If he is suggesting that he was taken against his will, or was under arrest, or that he did not voluntarily go with the agents, there is an insufficient basis in the record for these factual assertions. De-

fendant was pressured by his grandfather to go with the agents and to talk with them, but there is no indication that the agents pressured Defendant to go with them. Houpt's testimony was clear that he told Defendant before they got in the car that Defendant did not have to go with them, he did not have to talk with them, he was not under arrest, he would be free to leave at any time, and they would bring him back home. According to Houpt, Defendant had no objection to talking to them and he went with them voluntarily. Defendant testified that he was scared when they left his house. He said the agents looked at him in a way that defies description except to say that it was an intimidating look. He did not want to go with them, but he felt that he had to because his grandparents strongly urged him to. He was neither searched nor handcuffed. He was scared when they arrived at the parking lot because he thought they might beat him up and no one would be there to witness it or prevent it.

■ {32} We are not persuaded that the place and atmosphere of this interview constitutes overreaching or intimidating tactics. The conduct of these agents—their choice of location for the interview, their seating position in the car, and the statements made to Defendant prior to entering the car—was not improper.

■ {33} Defendant asserts that he signed the confession because the agents told him that signing it would help him out. They also told him not to worry. He argues that the confession is involuntary in part because it was signed in reliance on the agents' promise of leniency. The State maintains there was no promise of leniency, ex-

press or implied. Houpt testified that after the interview he asked Defendant to keep the interview confidential because there were other witnesses they had planned to interview and he told Defendant that he did not know what would happen.[2]

■ {34} "[T]he ultimate determination of voluntariness is a matter for the jury[,]" *State v. Tindle*, 104 N.M. 195, 199, 718 P.2d 705, 709 (Ct.App.1986), but here, since the issue of promises of leniency was raised at the suppression hearing, it is implicit that the trial court found that any such promise did not vitiate voluntariness, although we cannot tell whether it ruled that the confession was voluntary despite there being an implied promise of leniency, or ruled that it was voluntary in part because there was no implied promise of leniency. There was no specific finding of fact on the issue. In spite of this absence of a finding of fact, we review the question of promises of leniency de novo. In *State v. Attaway*, 117 N.M. 141, 146, 870 P.2d 103, 108, n. 2 (1994), we said:

> The interests of judicial administration, however, require de novo review of the trial court's determination of exigency [in the reasonableness of a search]. While it would be helpful for the trial court to enter findings of fact and conclusions of law in suppression hearings, the failure to do so will not preclude de novo review.

Defendant's testimony, taken on its face, would not clearly establish that he was promised leniency in exchange for signing the confession. Therefore it cannot be said that the confession was clearly inadmissible. The question thus becomes one of an indirect or implied promise. The test in such a case is "whether the accused could reasonably have

---

2. The State also argues that Defendant failed to preserve the leniency issue because he did not argue the issue in the trial court, citing *State v. De Jesus–Santibanez*, 119 N.M. 578, 580, 893 P.2d 474, 476 (Ct.App.1995), where the Court of Appeals said, "Our recent cases have refused to consider contentions raised for the first time on appeal when the failure to raise those contentions in the trial court has deprived the prevailing party of an opportunity to develop facts that might bear on the contentions." Defendant argues that since he testified as to promises of leniency at the suppression hearing and since Houpt testified that he told Defendant that he did

not know what was going to happen, the issue was joined and "a ruling or decision by the district court was fairly invoked," as required by Rule 12–216(A) NMRA 1998, in the context of its broader decision on voluntariness. Other than to speculate that this testimony was elicited for some irrelevant purpose, we must assume that leniency was an issue at trial, and that the fact of such testimony was "sufficient to alert the trial court and opposing counsel to the substance of the argument being made." *Garcia ex rel. Garcia v. La Farge*, 119 N.M. 532, 540, 893 P.2d 428, 436 (1995).

inferred a promise going to the punishment for the crime to be confessed." *State v. Wickman,* 39 N.M. 198, 204, 43 P.2d 933, 937 (1935). In this case, even if we accept Defendant's assertions of leniency as uncontradicted, we cannot say that circumstance alone would compel a determination that the confession was involuntary.

{35} Defendant next contends that the interview's length of approximately 100 minutes in conjunction with other factors rendered the confession involuntary. Houpt testified that he took seven pages of notes during the interview and periodically interjected questions of clarification. Defendant testified that the agents took notes, but that they essentially narrated the story. According to Defendant, his role in the interview was limited to interjecting when he remembered relevant facts. After the interview, Houpt wrote the statement in his own handwriting based on notes he had taken during the interview. Conejo and Defendant talked casually while Houpt prepared the statement. Under these circumstances, 100 minutes is not an unreasonable length of time for an interview about a homicide.

{36} Much longer interrogations have been held to be acceptable without rendering a confession involuntary. *See e.g., Jenner v. Smith,* 982 F.2d 329, 334 (8th Cir.1993) (six or seven hours); *Martin v. Wainwright,* 770 F.2d 918, 927 (11th Cir.1985) (five hours); *William v. Nye,* 869 F.Supp. 867, 871 (D.Kan.1994), *aff'd,* 83 F.3d 434 (10th Cir. 1996) (nineteen hours); *State v. Means,* 547 N.W.2d 615, 621 (Iowa App.1996) (four hours); *People v. Harris,* 191 A.D.2d 901, 594 N.Y.S.2d 914, 916 (3 Dept.1993) (two hours). We hold that the length of this interview was not a circumstance of involuntariness.

{37} In our review of the factors raised by Defendant, we conclude that his mental state, age, and education weigh in favor of voluntariness. His fear of detectives also weighs in favor of voluntariness because there is no indication these agents were aware of or should have been aware of his

fear or the incident giving rise to that fear. The place, atmosphere, and length of the interview weigh in favor of the State because they were explained by plausible and legitimate reasons that did not suggest coercion by the agents: the agents' safety, the need for freedom from distractions, and so forth. Except for Defendant's bare contention, there is no suggestion among any of these factors that the contention was involuntary.

{38} The only factor weighing in Defendant's favor is the possibility that he was implicitly promised leniency.[3] On balance, these factors lead us to conclude that Defendant's will was not overborne and his self-determination was not critically impaired. Therefore, the trial court properly ruled that the use of this confession against Defendant did not violate his Fourteenth Amendment right to due process.

2. MIRANDA

{39} Defendant argues that a one-hour-and-forty-minute interrogation by two FBI agents in the back of a police car, resulting in a signed confession to a murder, constitutes custodial interrogation. If that is correct, Defendant was entitled to be given his rights under *Miranda,* 384 U.S. at 478–79, 86 S.Ct. 1602, *see State v. Juarez,* 120 N.M. 499, 502, 903 P.2d 241, 244 (Ct.App.1995), and his detailed, written and signed confession was inadmissible at trial. The confession at issue here was admitted after a suppression hearing where the trial judge found that Defendant was not in custody at the time he made his statement. In reviewing that decision, we bear in mind that "there is a distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *Juarez,* 120 N.M. at 502, 903 P.2d at 244. There is no dispute as to the basic facts. The trial judge used as his standard of law the case of *State v. Swise,* 100 N.M. 256, 256–57, 669 P.2d 732, 732–33 (1983), in which police had information that the deceased had been seen

---

**3.** Ironically, some of the facts indicating the confession was voluntary also suggest that it was reasonable for the Defendant to construe the agents' statements as an implied promise of leniency.

several days prior to his death handcuffed and restrained by the defendant. The police went to the defendant's place of business and told him they were investigating a homicide. The defendant was interviewed for seven to ten minutes. During the interview, the defendant was not "held under any type of restraint." *Id.* at 257, 669 P.2d at 733. The defendant gave a statement which the trial court had suppressed, a decision this Court reversed on appeal.

{40} The State concedes that what took place in this case was an interrogation; the only issue is whether the interrogation was "custodial." That word has a somewhat honed meaning under federal and state cases that have addressed the issue. *Miranda* applies when a suspect's freedom of movement is restrained to a "degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *State v. Chamberlain*, 112 N.M. 723, 728, 819 P.2d 673, 678 (1991). A suspect is also considered in custody if a reasonable person would believe that he or she were not free to leave the scene. *See United States v. Caldwell*, 954 F.2d 496, 499 (8th Cir.1992); *United States v. Long*, 866 F.2d 402, 405 (11th Cir.1989). "The test is objective: the actual subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir.1996). The Eighth Circuit has held that relatively important factors in the matter are "the purpose, place, and length of interrogation." *United States v. Sutera*, 933 F.2d 641, 646 (8th Cir.1991); *United States v. Lanier*, 838 F.2d 281, 285 (8th Cir.1988). Factors cited by the Ninth Circuit include the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant. *United States v. Beraun–Panez*, 812 F.2d 578, 580, *modified*, 830 F.2d 127 (9th Cir.1987).

{41} As emphasized in *Miranda*, *see* 384 U.S. at 467, 86 S.Ct. 1602 (noting "inherent compulsions of the interrogation process"), the practical effect of an interrogation may give rise to a holding that the suspect was in custody. The mere "compulsive aspect" of a custodial interrogation emphasized in *Miranda* was referenced in *United States v. Layne*, 973 F.2d 1417, 1421 (8th Cir.1992) and *United States v. Berisha*, 925 F.2d 791, 797 (5th Cir.1991). Custody exists when a reasonable person would have believed they had no choice but to submit, *United States v. Mussaleen*, 35 F.3d 692, 697 (2d Cir.1994), or where the interrogation is no more than a veiled attempt at eliciting an incriminating statement, "the functional equivalent of custodial interrogation for *Miranda* purposes." *United States v. Batista–Polanco*, 927 F.2d 14, 20 (1st Cir.1991). *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) required only "some officially coerced self-accusation" (quoting *United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977)), and discussed certain custodial circumstances which are "inherently coercive."

{42} In the instant case, there are two facts which could lead to the conclusion that Defendant was in custody at the time of his interrogation. One is the location of the interrogation—in a police car—and the other is the length of the interrogation—one hour and forty minutes. It is also true that Defendant had become the focus of the police investigation, but this factor alone is not enough to trigger the need to give warnings. *Lanier*, 838 F.2d at 285; *Swise*, 100 N.M. at 258, 669 P.2d at 734.

{43} There is no evidence in this case, however, that the basic question—whether Defendant's freedom of movement was restrained in a way that could be associated with a formal arrest—can be answered in Defendant's favor. When Defendant left his home to accompany the agents, they told him he did not have to come with them, he did not have to answer any of their questions or talk to them, he would not be under arrest, he could leave at any time, and they would bring him back home. They did not handcuff him, nor did they search him. There is no indication the car doors were locked during the interrogation, or that he was prevented from leaving the car. The interview was conducted in a car parked in a

public parking lot during daylight hours. The car was readily visible from a nearby busy thoroughfare. After the interview was completed, the agents indeed took Defendant home. The place of the interrogation and its length move one to look for coercive treatment that could be associated with an arrest, but except to say that he was "scared," not even Defendant offers any such evidence.

{44} We think this case is analogous to *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), where the United States Supreme Court said:

In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a half-hour interview respondent did in fact leave the police station without hindrance . . .

Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is the one whom the police suspect.

*See also United States v. Jones*, 21 F.3d 165, 170 (7th Cir.1994) (holding a defendant was not in custody for purposes of *Miranda* after he consented to go to police headquarters). We hold that Defendant was not in custody when he gave his confession to the FBI, that it was at the time unnecessary that he be given his *Miranda* warnings, and that his

Fifth Amendment privilege against self-incrimination was not violated.

## B. THE JURY INSTRUCTION.

{45} Jury instruction number five in the case was essentially the same as UJI 14–251 NMRA 1998 and read as follows:

For you to find the defendant guilty of First Degree Murder or Second Degree Murder, the state must prove to your satisfaction beyond a reasonable doubt that the act of the defendant caused the death of James Rogers.

The cause of death is an act which, in a natural and continuous chain of events, produces the death and without which the death would not have occurred.

Use note number two to UJI 14–251 provides that "if the acts of more than one person contributed to the death of the victim," the following language should be added to the instruction: "There may be more than one cause of death. If the acts of two or more persons contributed to cause death, each such act is a cause of death."

{46} The additional instruction was not given, and counsel did not object, but now calls our attention to *State v. Osborne*, 111 N.M. 654, 656, 808 P.2d 624, 626 (1991), where we said:

Our rules require the court to instruct the jury upon "all questions of law essential for a conviction of any crime submitted to the jury," SCRA 1986, 5–608(A) [Rule 5–608(A) NMRA 1998], and we have held that the failure of the court to instruct the jury on the essential elements of a crime constitutes fundamental or jurisdictional error.

As fundamental error, failure to instruct on an essential element of a crime need not be objected to or preserved for appeal in order to merit treatment by the appellate court, and may be ground for reversal. *See* Rule 12–216.

{47} "In determining what is or is not an essential element of an offense, we begin with the language of the statute itself[.]" *Osborne*, 111 N.M. at 657, 808 P.2d at 627. The murder statute, NMSA 1978, § 30–2–1 (1963) does not deal with the issue

of more than one person contributing to the cause of death, and there is not the slightest suggestion that if there are multiple individuals responsible for the death that any of them is less guilty of the crime of murder. The additional, omitted instruction is therefore merely elaborative of the primary instruction. *See State v. Stephens*, 93 N.M. 458, 462, 601 P.2d 428, 432 (1979) (holding that the failure to instruct on a definition or to amplify an element is not a failure to instruct on an essential element). Indeed, it expands, rather than contracts, the range of possible acts constituting the crime, so that its inclusion would have reinforced the notion in the jury's mind that this defendant could be guilty of murder even if his was not the sole act causing death. It is difficult to see how this would have helped Defendant's case. In any event, since the instruction did not relate to an essential statutory element of the crime, omitting it was not fundamental error.

{48} Citing *Poore v. State*, 94 N.M. 172, 174, 608 P.2d 148, 150 (1980), Defendant asserts, "If the state cannot adduce a single cause of death, and more than one person is involved, fundamental fairness requires the jury be instructed such that it can find a murder occurred, but that defendant did not do it." We agree with Defendant's assertion, but we think it is unconnected to any requirement that the additional instruction should have been given. The jury was in fact instructed, in instruction number four, that it had to find beyond a reasonable doubt that "the Defendant killed James Rogers." We think this instruction was sufficient to answer Defendant's assertion that the jury be given the opportunity to find that Rogers was in fact murdered but that Defendant did not kill him.

## C. SUFFICIENCY OF THE EVIDENCE.

{49} Defendant contends that there was insufficient evidence to support the jury's findings that Defendant caused James Rogers' death and that Rogers was killed in New Mexico. He asserts that the State's forensic expert's testimony could not support a finding that Defendant proximately caused the death of James Rogers and that the State failed to prove beyond a reasonable doubt that the killing took place in New Mexico.

{50} The standard of our review was stated in *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992):

[W]e perceive it to be an appellate court's duty on review of a criminal conviction to determine whether any rational jury could have found each element of the crime to be established beyond a reasonable doubt. This does not involve substituting the appellate court's judgment for that of the jury in deciding the reasonable-doubt question, but it does require appellate court scrutiny of the evidence and supervision of the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction.

Such review involves a two-step process: "deference to the resolution of factual conflicts and inferences derived therefrom, and a legal determination of whether the evidence viewed in this manner could support the conviction." *State v. Orgain*, 115 N.M. 123, 126, 847 P.2d 1377, 1380 (Ct.App.1993).

{51} The first factual conflict in this case concerns whether the screwdriver wounds admittedly inflicted by Defendant could have been the cause of death. Our review of the record includes review of the testimony of the state's forensic pathologist, whose expert status was undisputed and whose testimony was logical and proceeded clearly from the photographic record of his prior examination of the body of the victim. He testified both to the existence of screwdriver wounds to the side of the neck which caused massive bleeding, such bleeding meaning that the wounds were inflicted while the victim was still alive, and in general to the fact that death was caused by multiple stab wounds to the back and neck areas, causing excessive bleeding. This testimony, directly connecting the acts of Defendant with the cause of death, virtually paved the way for a jury finding to that effect, and the jury could easily have reached this conclusion beyond a reasonable doubt. The substantial evidence test is therefore satisfied.

{52} Under the same standard, we turn to Defendant's final argument, that the district court did not have jurisdiction because the murder did not occur in New Mexico. The sole basis for this argument is that the body was found outside the state, not that Rogers was murdered elsewhere and his body moved. The primary claim by Defendant here is that the Bureau of Land Management law enforcement officer who located the body was not an expert in the Global (or Geographical) Positioning System (GPS), a technique whereby a place on earth is pinpointed with respect to geographic standards using satellites and computers.

{53} The officer was not offered as an expert, was not qualified as an expert, and did not claim to be an expert in the use of GPS. In fact, he did not do the GPS work himself. Regardless of the GPS testimony, however, it was undisputed that it was part of the officer's job to be certain, wherever in the general area he was, of "land status," including the roads and landmarks in the exact area where the body was discovered. He looked at maps and placed the location of the body in New Mexico on the basis of a description of the scene by Agent Houpt. He drove to the site himself and saw it was on the New Mexico side of a dirt road that is known as running along the state line. He was also able to orient with respect to at least one building in the area. Therefore, whatever his deficiency with GPS, there was substantial other evidence that the murder occurred in New Mexico.

## III. CONCLUSION.

{54} On the basis of the foregoing discussion, we affirm the judgment of the district court.

{55} **IT IS SO ORDERED.**

FRANCHINI, C.J., and BACA, MINZNER, and SERNA, JJ.

