**UNITED STATES of America,**

v.

**Clarence HEATLEY, et al., (John Porter), Defendants.**

**No. S11 96 CR. 515 SS.**

United States District Court, S.D. New York.

Feb. 13, 1998.

---

· Mary Jo White, United States Attorney, Southern District of New York, New York, NY, Andrew S. Dember, Sharon L. McCarthy, Assistant United States Attorneys, Gregg N. Sofer, Special Assistant United States Attorney, for U.S.

David Cooper, New York, NY, David Cooper, for Defendant John Porter.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Defendant John Porter moves this Court to suppress statements he made to agents of the New York County District Attorney's office prior to his indictment and arrest on the charges in this case. Porter claims that these statements were made only after the agents promised him that they would not use his statements against him and one agent promised he would act as his attorney to protect his legal interests. Porter claims that his inculpatory statements were thereby elicited in violation of the Fifth Amendment. The United States denies that either of these promises were made. An evidentiary hearing was held on November 10 and 12, 1997, to resolve these disputed issues of fact. As

discussed below, this Court finds the defendant's story not to be credible and denies Porter's motion to suppress.

## BACKGROUND

The following constitute my findings of fact. The defendant, John Porter, is under indictment in this case on charges of conspiring to and engaging in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and (d), conspiring to and committing violent crimes in aid of a racketeering enterprise in violation of 18 U.S.C. § 1959(a)(1) and (5), and firearms and accessory charges in association with the racketeering charges. The alleged racketeering enterprise is known as the "Preacher's Crew," and is asserted by the government to have been involved in numerous murders, assaults, robberies, extortions, and narcotics trafficking in and around New York City and elsewhere.

Dan Rather is an Assistant District Attorney and chief of the firearms trafficking unit of the New York County District Attorney's office. In the summer of 1996, Rather was involved in an investigation into the activities of the Preacher's Crew, and in August of that year his attention began to focus on Porter. Rather thought that Porter had information regarding the Preacher Crew which might be useful to his investigation, and further thought that Porter might be willing to meet and talk to him regarding this information.

To accomplish this meeting, Rather turned to John Capers. Capers is a former NYPD detective and now is employed as an investigator by the New York County District Attorney. Capers had previous contact with Porter and some of his family several years earlier while investigating the murder of Darnell Porter, John Porter's nephew. Capers was also familiar with some of Porter's alleged criminal activities. After attempting unsuccessfully to locate Porter on his own, Capers talked with Porter's niece and asked her to convince Porter to talk him. She did so, and on August 29, 1996, Capers drove to the vicinity of 130th Street and Seventh Avenue in Manhattan, where Porter met him at approximately 8:30 p.m.

Capers and Porter talked first in Capers's car. Porter inquired as to Capers's position, and Capers informed him that he was investigator for the District Attorney's office. After a brief conversation, Capers began driving downtown towards the District Attorney's office, hoping that by the time they got in the vicinity Porter would have decided to talk with Rather. During the drive, Capers and Porter discussed the fact that Clarence Heatley, one of the co-defendants in this case, had recently been arrested and that there were rumors on the street that Heatley might be cooperating with the government. Capers told Porter that, based on past experience, the first persons arrested in a case involving multiple defendants are often given the chance to cooperate, but did not confirm or deny whether Heatley was in fact doing so. Capers also told Porter that he was likely to be indicted in the future, and told him that in his experience, persons who cooperate with the government get some benefit in the form of a reduced sentence.

Capers and Porter also discussed the safety of Porter and his family. Porter expressed concern that members of the Preacher's Crew might threaten him and his family. Capers told Porter that, if he were to become a cooperating witness for the government, the District Attorney's office could take steps to insure his family's safety, but Capers told Porter that such terms would have to be worked out with Rather and the District Attorney's office.

Upon reaching the vicinity of the D.A.'s office, Porter agreed to meet with Rather, at least for the purposes of finding out Rather's intention. Capers called Rather on his mobile phone and suggested they meet at the Chelsea Piers, an entertainment/sports complex on the West Side Highway near 23rd Street in Manhattan. Capers then drove with Porter to the Piers, and the two of them were met by Rather and Assistant District Attorney Gregg Sofer.

At the Piers, Rather introduced himself to Porter as an Assistant District Attorney. Rather told Porter that according to his information, Porter was an associate of Heatley and the Preacher's Crew. In response to

Porter's statement that "You must think I'm a monster; I'm not a monster," Rather replied that yes, based on what information he had, he did think Porter was a monster, but that he had no choice but to believe that information because he didn't have Porter's side of the story. Porter admitted knowing Heatley, but denied being a member of the Preacher's Crew, asserting that he had only done two crimes since getting out of jail. Rather expressed disbelief at this statement.

Rather also discussed his belief that Porter was in danger from members of the Preacher's Crew because the fact that Porter had not yet been arrested might lead the Crew members to believe he was cooperating with the authorities. This was particularly so, Rather said, in light of the fact that Porter had already been shot once and left to die by members of the Crew at an earlier time because they viewed Porter as a potential threat. Porter confirmed that he was concerned about his safety and that of his family, particularly his son. Rather also told him that even if he didn't get killed on the street, he was very likely to be arrested at some point. Porter agreed with Rather's assessment of the situation. Rather asked Porter if he was willing to come to the D.A.'s office to talk further, and Porter said he was, but no specific date for a second meeting was set. Porter was told to contact Capers if he wanted to talk further. The meeting broke up, and Capers drove Porter back to his neighborhood.

The next day, Friday, August 30, Porter called Capers and indicated a willingness to talk. Capers picked him up that night and registered Porter in an assumed name at a local hotel, giving Porter the keys. Capers gave Porter money for meals for the weekend, then drove him back uptown to his neighborhood. Porter was free to come and go as he pleased, and no other law enforcement officers knew of his whereabouts. Capers and Porter had no further contact that weekend.

On Tuesday, September 3, Capers picked up Porter at the hotel and drove him to the D.A.'s office downtown to meet Rather. They first went to Capers's office, which is one floor below Rather's, then to Rather's office. While in Capers's office that day, Porter admitted seeing certificates on the wall commissioning Capers as an NYPD detective and as an investigator for the New York County D.A.'s office. Rather was, however, unable to meet on that day, so Capers took Porter back to the hotel.

On the next day, September 4, Capers once again picked up Porter and took him to meet Rather. On that day, Porter, Capers, Rather, and Sofer all met in Rather's office at One Hogan Place, the office of the New York County D.A. At the beginning of this meeting, Porter noticed some electronic equipment in Rather's office, and asked whether he was being recorded; Rather assured him he was not. This was in fact true; no recording was done during that first meeting on September 4. Rather began talking to Porter about the two crimes Porter had mentioned at the Chelsea Piers, and after some discussion of these crimes, Rather turned the discussion to a series of four murders. Porter implicated himself at least to some extent in those murders that day. Towards the end of the conversation, Rather, Sofer, and Capers left the room to discuss whether to place Porter under arrest for the murder of James Taylor (a/k/a "LTD"). They decided that because there still more information to be extracted from Porter, and because the September 4 discussion had not been recorded in any way, they would not arrest Porter then so that the discussions could continue.

The next meeting was on September 6. For this meeting, Rather had his office wired with hidden audio and video recording equipment. Porter did not ask again whether he was being recorded. During this conversation, Rather asked Porter to go back over some of what had been said on September 4 and also turned to other crimes. Porter implicated himself in various ways in several of the crimes charged in this indictment during that conversation.

The next and last meeting was on September 13. This time, the meeting was not in Rather's office, but in a conference room in the D.A.'s offices. Rather, Porter, Capers and Sofer had a brief conversation, about 15 minutes, in which Rather told Porter he

thought Porter had been lying by minimizing his involvement in two of the murders they had discussed, and that if he was going to lie about such fundamental details there was no point in continuing the conversation. When Porter insisted he was telling the truth, Rather left the room, leaving Capers and Sofer behind. After another 15 minutes or so, Rather called Capers out of the room, and Capers reported that Porter was sticking to his denials. At that point, believing no further information would be forthcoming, Rather arranged for detectives to come to arrest Porter for the murder of James Taylor.

At no time prior to this arrest on September 13 was Porter ever told or given any reason to believe that he was not free to leave, to come and go as he pleased, or to decide not to speak further to Rather or Capers. Finally, Porter was first indicted on the charges in this case on November 14, 1996.

The foregoing is largely not in dispute. There are, however, two significant facts argued by the parties. First, Porter claims that, during their first conversation on August 29 (prior to the Chelsea Piers meeting), Porter asked Capers whether he would act as his attorney during the conversations with Rather. Capers denies ever making such a promise. The Court finds that no such promise was made. Capers was working for the D.A.'s office; he told Porter this, and this Court so finds. Even though Porter disputes this fact, he admits that Capers referred to himself as an "investigator," referred to his "colleagues" in the D.A.'s office, took Porter to his office in the D.A.'s building one floor below Rather, and that Porter saw his credentials as an investigator while he was in Capers's office. There was, at least, no apparent attempt on Capers's part to hide his association with the D.A.'s office. It is so implausible that anyone would believe an investigator for the District Attorney would act as an attorney for a criminal suspect, or that a suspect with Porter's experience with the criminal justice system would entrust his legal representation to an employee of the D.A., that this Court finds it incredible that Capers, even if he were inclined to employ some sort of ruse to get Porter to talk, would

think that this particular ruse could work. This Court finds that neither Capers nor any other government agent represented to Porter that they would act as his attorney.

Second, Porter claims that Rather and Capers promised him that anything he said would be "off the record" and would not be used against him—in effect, granting Porter use immunity. Rather and Capers claim no such promise was made. Rather did tell Porter that the purpose of the discussions would be for him to understand Porter better and to get background on their investigation; not surprisingly, Rather did not tell Porter that he was attempting to elicit information from Porter to use in a possible criminal case against him. Rather also did represent to Porter at the September 4 meeting that the conversation was not being recorded—a true statement—but did not make this representation on subsequent days. Even if it were reasonable for Porter to believe that this meant none of the sessions would be recorded, a promise not to record the conversation is in no way a promise that the information being told to the D.A. would not be used against him. Finally, as for Capers, he did tell Porter that if he were to become a cooperating witness he could possibly get something in return, but this Court finds that he never promised Porter immunity in return for speaking with the D.A.'s office. In sum, this Court finds that no promise of immunity was ever made.

### DISCUSSION

The Court now turns to the legal significance of these facts. Preliminarily, the Court notes that, as conceded by Porter, prior to his arrest on September 13 he was not in custody; therefore, he was not entitled to *Miranda* warnings. *See, e.g., Neighbour v. Covert,* 68 F.3d 1508, 1510 (2d Cir.1995). Nor had he yet been charged with any crimes, so his Sixth Amendment right to counsel had not attached. *See, e.g., United States v. Kon Yu–Leung,* 910 F.2d 33, 37 (2d Cir.1990).

 This of course does not end the inquiry, for a confession may still be deemed involuntary, such that the Fifth Amendment forbids its introduction at trial, if "an exami-

nation of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *United States v. Mitchell,* 966 F.2d 92 (2d Cir.1992) (internal quotations omitted). Impermissible conduct includes not only force and threats of force, *see Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 1252–53, 113 L.Ed.2d 302 (1991), but the Second Circuit has also noted that "material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will." *United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir. 1995). In making this determination, the Court must consider "the totality of all the surrounding circumstances," *id.* at 264–65 (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)), including Porter's "background and experience, the conditions of his interrogation and the conduct of the law enforcement officers." *Ruggles,* 70 F.3d at 265. However, at a minimum, there must be some element of police misconduct giving rise to the confession in order to find a confession involuntary. *See Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."). The burden is on the government to establish the voluntariness of a confession by a preponderance of the evidence. *See United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991).

There is simply no such misconduct here. There is, first of all, no claim that the police used physical force, threats, or in any way mistreated Porter; to the contrary, Porter was placed in a hotel for approximately two weeks and given money for expenses. In addition, the Court has already noted that it finds that the government has shown by a preponderance of the evidence that no gov-

ernment agent promised Porter immunity from prosecution or that his statements would not be used against him. Rather did represent to Porter that he was not being recorded on September 4, but this was in fact true, and Rather made no such representations on the days he did record the statements. Finally, the government has shown by a preponderance of the evidence that Capers made no representation to Porter that he would act as his attorney.[1]

We are left, then, with only two representations by the government that could possibly form the basis of a claim of misconduct. The first is the representation by Capers to Porter that he was likely to be indicted, and that in his experience the earlier one expressed willingness to cooperate with the government the better a deal a defendant might get. The Court has found that Capers did not promise Porter a cooperation agreement, but only talked in general terms about the benefits of cooperation. There is nothing improper in this conduct. The government is free to tell a suspect the benefits of cooperation, *see, e.g., Ruggles,* 70 F.3d at 265; *United States v. Bye,* 919 F.2d 6, 9–10 (2d Cir.1990), as long as "the characteristics of the suspect and the conduct of the law enforcement officials do not otherwise suggest that the suspect could not freely and independently decide whether to cooperate or remain silent." *United States v. Guarno,* 819 F.2d 28, 31 (2d Cir.1987). There is nothing to suggest such a result in the encounter between Porter and Capers, and thus there was nothing improper about Capers's discussion of this point.

The second possible basis for finding misconduct were the discussions by Rather and Capers with Porter about the safety of Porter and his family, and the statements by them which suggested that if Porter were to become a cooperating witness, his family could be given protection. While it is true

---

1. The Court notes that the Second Circuit has held that "to prevail on a claim of trickery and deception, [a defendant] 'must produce clear and convincing evidence that the agents affirmatively misled [him] as to the true nature of their investigation.'" *Mitchell,* 966 F.2d at 100 (quoting *United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir.1987)). This Court need not decide to what extent this clear and convincing burden applies to Porter, since the Court is convinced that a preponderance of the evidence supports the position that no such trickery and deception occurred here.

that a confession induced by a credible threat of physical violence to the suspect, combined with a government promise of protection conditioned upon the suspect's confession, can be considered involuntary, *see Fulminante,* 499 U.S. at 287, 111 S.Ct. at 1252–53, the discussions in this case do not rise to the level seen in *Fulminante.* To begin with, the threat to Porter's safety (if any) stemmed from his alleged co-conspirators; government agents played no part in creating the danger. Second, Rather and Capers never suggested that the police would refuse to protect him and his family if he did not confess. Instead, they were doing two things: first, informing Porter of one of the possible benefits of cooperation (i.e., getting off the street and out of danger), and second, allaying any possible fear that if Porter should choose to become a cooperator, his family would be subject to recriminations from his alleged co-conspirators. As noted earlier, there is nothing improper in spelling out for a suspect the benefits that could flow from his cooperation.

The Court can therefore find no government misconduct upon which a claim of involuntariness could rest. However, even if any of the above conduct were deemed improper, at least for purposes of satisfying *Connelly,* under the totality of the circumstances the Court finds that the government has met its burden of showing that Porter's will was not overborne and that his confession was therefore voluntary. Porter had substantial experience with the criminal justice system, having been arrested several times before. He testified that he had been read his *Miranda* rights on these occasions and that he understood what those rights were. He also stated that he understood that Rather was an Assistant District Attorney conducting a criminal investigation. Porter knew he was under no obligation to confess involvement in criminal activity to Rather. He did so because he chose to focus, perhaps unwisely, on the possibility that cooperation with the D.A.'s office would pay off in some way to the exclusion of carefully considering whether he had received any promise that his confessions would not be used against him. In short, Porter heard what he wanted to hear. There is little doubt that Rather and Capers chose their words and actions carefully in an attempt to capitalize on Porter's desire to extricate himself from the possibility of arrest and conviction, but they did not act improperly in doing so. The choice to speak was at all times Porter's. There is, then, no basis for suppression of his statements.

### CONCLUSION

For the foregoing reasons, the Court denies Porter's motion to suppress his statements as involuntary.

**SO ORDERED.**