13 P.3d 460

2000-NMSC-032

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Richard E. SANDERS a/k/a Eddie
Sanders, Defendant–
Appellant.**

No. 25,569.

Supreme Court of New Mexico.

Oct. 19, 2000.

Law Systems of Las Cruces, P.A., Anthony F. Avallone, Radium Springs, NM, for Appellant.

Patricia A. Madrid, Attorney General, James O. Bell, Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

BACA, Justice.

{1} Defendant, Richard Eddie Sanders, was convicted of willful and deliberate first degree murder contrary to NMSA 1978, § 30–2–1(A)(1) (1994) and numerous other crimes [1] stemming from his involvement in a drug trafficking ring that operated in southern New Mexico. Sanders' sentence to life imprisonment vests this Court with jurisdiction. *See* N.M. Const. art. VI, § 2 (as amended 1965); *see also* Rule 12–102(A)(1) NMRA 2000. Sanders appeals his conviction on three grounds. He alleges that the district court: (1) improperly admitted his confession in violation of the Due Process Clause

of the Fourteenth Amendment's prohibition against coerced confessions; (2) committed reversible error by improperly rejecting his proffered jury instructions regarding the voluntariness of his confession; and (3) improperly denied his motion to monitor the jury culling process. Finding no error in the rulings of the trial court, we affirm Sanders' convictions.

## I.

{2} Sanders' conviction resulted from a Federal Bureau of Investigation (FBI) probe into a suspected drug organization operating in southern New Mexico. In conjunction with its drug investigation, the FBI was also investigating the disappearance of Darrett McCauley, a purported member of the drug organization. During the course of their investigation, the FBI learned of a threat on Sanders' life and that members of the drug organization considered him a "loose end that had to be taken care of." The FBI has a policy of alerting intended victims of threats on their lives which they have learned of during the course of an investigation. Accordingly, two agents, Mr. Colbridge and Mr. Pittman, visited Sanders' father's feed store in Alamogordo on July 27, 1994, in an attempt to contact Sanders. Because Sanders was not available, the agents spoke with his father, advised him of the threat, and left a contact number for Sanders to reach them. The next day, Sanders called the FBI and left a cellular telephone number where he could be reached. FBI Special Agent Pittman returned Sanders' call. Statements made during this initial conversation between Special Agent Pittman and Sanders provide the basis for Sanders' Due Process challenge. The conversation occurred as follows:

| SA Pittman: | Well, we, we … ah … talked to your father, Jim? |
| Eddie Sanders: | Yeah. |
| SA Pittman: | Yesterday, um … we … like we told him … we needed to contact you and advise you that … ah … |

---

1. Sanders was also convicted of the following: conspiracy to commit first degree murder contrary to NMSA 1978, § 30–28–2 (1979) and Section 30–2–1; false imprisonment contrary to NMSA 1978, § 30–4–3 (1963); conspiracy to commit false imprisonment contrary to Section 30–28–2 and Section 30–4–3; and accessory to aggravated battery contrary to NMSA 1978, § 30–3–5(C) (1969) and NMSA 1978, § 30–1–13 (1972).

Eddie Sanders: I've got problems.

SA Pittman: Well, not that you've got problems that ... ah ... during the investigation of our we've recently received information ... ah ... that your life might be in danger.

Eddie Sanders: Okay, would it help you all in the investigation if I cooperated any at all?

SA Pittman: It's ... it certainly would and ... and may in fact help yourself.

Eddie Sanders: Well, I'm ready.

SA Pittman: Okay, you need to understand that I can't promise you anything.

Eddie Sanders: Yeah, I realize that.

SA Pittman: But what I can do is I can ... um ... communicate to the U.S. Attorney with whom I, I work on a daily basis about your cooperation.

Eddie Sanders: Okay.

SA Pittman: Okay, now ... um ... when would you like to get together?

Eddie Sanders: Ah ... what would be convenient for you all cause I really kind of hate to get back in Alamogordo for a little while because I've got some other problems there.

SA Pittman: Okay.

Eddie Sanders: My girlfriend got beat up a couple of nights ago and raped and that's one of the reasons that we're out of town.

(Agent Pittman and Sanders then arranged a tentative time to meet in Las Cruces.).

Eddie Sanders: I should get over there ... ah ... I just call you sometime in the morning and let you know where I'm at and everything.

SA Pittman: Okay.

Eddie Sanders: Cause ... ah ... I'd like for you all to go ahead and keep track of me.

SA Pittman: Okay.

Eddie Sanders: You know ... cause ... ah....I don't know what the investigation is about but I have a sneaking suspicion about how it's originated.

SA Pittman: Okay.

Eddie Sanders: And ... ah ... I've.

SA Pittman: Now if we ... I'm gonna be frank with you Eddie, if we get together I don't, I don't wanna dance around. I want, I would like to get to the point and get to the bottom of this.

Eddie Sanders: Me too. No problem at all.

SA Pittman: Okay.

Eddie Sanders: Ah, you know I've been ... this has been kind of in the back of my head, bugging me for probably a year.

SA Pittman: Okay.

(Conversation ends with confirmation that Defendant should call in the morning to arrange meeting with Special Agent Pittman.).

{3} Following this conversation, Sanders met Special Agent Pittman and Agent Colbridge at a Super 8 Motel in Las Cruces, New Mexico. Sanders was driven to the Super 8 by his girlfriend and his father. During this meeting, Sanders gave what was to be the first of a number of detailed confessions in which he described the killing of Darrett McCauley and provided information that led to the discovery of McCauley's remains in the forest of Catron County. At the conclusion of the initial interview on July 28, 1994, Sanders signed an FBI Advice of Rights interrogation form which contained his rights under *Miranda* and the following statements: "I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." He again signed advice of rights forms when he met with the FBI on August 9, 1994, and August 15, 1994.

{4} Sanders was subsequently charged with the murder of Darrett McCauley. Sanders filed a motion to suppress the contents of his confession, alleging that it was coerced by Special Agent Pittman's indication that he would communicate his cooperation to the United States Attorney's office. Sanders also maintained that the FBI coerced his confession by informing him of the threat on his life. The district court conducted a suppression hearing at which Sanders and the FBI agents testified. In addition to the transcript of the conversation, the trial court also considered a number of other relevant factors. The trial court detailed those findings of fact after the suppression hearing: (1) Defendant, an adult male born March 1953, completed high school and reads and understands the English language; (2) Defendant was having some "problems" in 1994 which included the suspicious destruction of both his truck and home and the rape of his girlfriend; (3) In May of

1994, Defendant sought treatment for depression, was prescribed Prozac, but was not taking his medication at the time of his confession; (4) In May of 1994, while fighting forest fires, Defendant became seriously depressed and started using marijuana, but during a subsequent fire in June of 1994, he worked hard for 20 days without incident; (5) On the day of his confession, Defendant appeared in good health and did not appear to be under the influence of alcohol or drugs. After reviewing all of the relevant factors, the district judge ruled, based on the totality of the circumstances, that Sanders' statement was "completely voluntary." Sanders seeks review of this conclusion. He also alleges that the district court committed reversible error by refusing to give his proffered jury instructions with regard to the voluntariness of his confession. Finally, he asserts that he should have been allowed to participate in the jury qualification or culling process.

## II.

{5} Sanders was not in custody and was free to leave when he gave his initial confession and therefore he does not assert that his confession was taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Instead, Sanders asserts that his confession was improperly induced by police coercion and that the use of the confession at trial was in contradiction of the Due Process Clause of the Fourteenth Amendment. *See State v. Cooper*, 1997–NMSC–058, ¶ 31, 124 N.M. 277, 949 P.2d 660 (detailing the analytical distinction between a *Miranda* analysis and a voluntariness analysis); *see also Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (seminal case holding that a confession obtained by brutality and violence was constitutionally invalid under the Due Process Clause of Fourteenth Amendment).

{6} We review the voluntariness of a defendant's confession based on the totality of the circumstances. *See Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (reaffirming the "totality of the circumstances" as the proper inquiry); *Cooper*, 1997–NMSC–058, ¶ 26, 124

N.M. 277, 949 P.2d 660. "Voluntariness means 'freedom from official coercion.'" *State v. Munoz*, 1998–NMSC–048, ¶ 21, 126 N.M. 535, 972 P.2d 847 (quoting *Miller v. Dugger*, 838 F.2d 1530, 1538 (11th Cir.1988)). However, not all confessions obtained by police violate the Due Process Clause. "The police may be midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation." *Culombe v. Connecticut*, 367 U.S. 568, 576, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Therefore, it is the duty of this Court to determine whether Sanders' "will has been overborne and his capacity for self-determination critically impaired" in such a way as to render his confession the product of official coercion. *Munoz*, 1998–NMSC–048, ¶ 20, 126 N.M. 535, 972 P.2d 847 (quoting *Culombe*, 367 U.S. at 602), 81 S.Ct. 1860. "[W]e review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a defendant's confession was voluntary." *State v. Fekete*, 120 N.M. 290, 298, 901 P.2d 708, 716 (1995).

{7} Sanders finds support for his contention that his confession was coerced in *State v. Aguirre:* "For a confession to be voluntary, it must not have been extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exercise of any improper influence." 91 N.M. 672, 675, 579 P.2d 798, 801 (Ct.App.1978). Sanders contends that the language "however slight" means that the FBI's warning him about the threat on his life and offering to speak to the United States's Attorney on his behalf were improper inducements. However, the Court of Appeals, in *Aguirre*, analyzed the police officer's promise not to prosecute on other charges in the context of the totality of the circumstances. The Court in *Aguirre* expressly states, "[the] promise was no more than an additional factor for the trial court to consider, as a part of the totality of the circumstances, in deciding whether the confession was voluntary." 91 N.M. at 675, 579 P.2d at 801. Therefore, contrary to creating a per se rule as advanced by Sanders, the existence of promises or threats of violence is but one

factor to be considered in analyzing the totality of the circumstances.

{8} Additionally, the expansive language relied on by Sanders from *Aguirre* originated in *Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897).[2] The United States Supreme Court has expressly departed from the standard set forth in *Bram,* stating, "it is clear that this passage from *Bram,* . . . under current precedent does not state the standard for determining the voluntariness of a confession. . . ." *Fulminante,* 499 U.S. at 285, 111 S.Ct. 1246; *see also State v. Broadaway,* 133 Wash.2d 118, 942 P.2d 363, 371 (1997) (recognizing that the test from *Bram* "is not the correct test of voluntariness"); *Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879, 883 (1998) ("The United States Supreme Court has explicitly declared that the quoted passage from Bram is not the correct standard for determining the voluntariness of a confession, instead the totality of the circumstances determine voluntariness."). Moreover, other pre-*Fulminante* cases citing this broad language from *Bram* have generally applied it in the context of the totality of circumstances, as the Court of Appeals did in *Aguirre. See, e.g., United States v. Jackson,* 918 F.2d 236, 242 (1st Cir.1990) (recognizing that although *Bram* has not been overruled, it has been modified; any threats or promises are reviewed as part of the totality of the circumstances); *United States v. Long,* 852 F.2d 975, 977 (7th Cir. 1988) ("[*Bram* ] does not establish a per se rule; a review of the totality of the circumstances is still required[.]"); *Miller v. Fenton,* 796 F.2d 598, 608 (3rd.Cir.1986) (stating that the *Bram* test "has not been interpreted as a *per se* proscription against promises made during interrogation"); *United States v. Ferrara,* 377 F.2d 16, 17 (2d. Cir.1967) (relying upon totality of the circumstances and observing that the *Bram* "language has never been applied with the wooden literalness urged upon us by appellant.").

{9} Therefore, Sanders' reliance on *Aguirre* for proposition that "any sort of threats or violence" or "any direct or implied

promises, however slight" operates to render a confession involuntary is not a proper articulation of the applicable law. 91 N.M. at 675, 579 P.2d at 801. Because Sanders asserts that both a promise and a threat of violence induced his confession, for clarity of analysis, we will discuss each factor independently and then evaluate the totality of the circumstances.

## A.

{10} Sanders claims that Special Agent Pittman's promise to inform the United States Attorney about his cooperation with the FBI investigation was sufficient to induce his confession. However, numerous courts have held that merely promising to bring a defendant's cooperation to the attention of the prosecutor is not objectionable. *See United States v. Lewis,* 24 F.3d 79, 82 (10th Cir.1994) ("That type of limited assurance [informing U.S. Attorney of cooperation] does not taint ensuing statements as involuntary."); *United States v. Guerrero,* 847 F.2d 1363, 1366 (9th Cir.1988) ("An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect."); *United States v. Brandon,* 633 F.2d 773, 777 (9th Cir.1980) ("We reject the defendant's contention that the agents' promise to bring the fact of Bracelin's cooperation to the attention of the United States Attorney and to recommend leniency, and Bracelin's expectation of it, constituted coercion."); *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978) ("Neither is a statement that the accused's cooperation will be made known to the court a sufficient inducement so as to render a subsequent incriminating statement involuntary."); *see also* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.2(c), at 454 (1999) ("Merely promising to bring defendant's cooperation to the attention of the prosecutor is not objectionable, nor is a promise that if

**2.** *Aguirre* cites to *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), which

in turn cites to *Bram.*

defendant confessed the prosecutor would discuss leniency.") (footnote and emphasis omitted). Based on this reasoning, we hold that the mere offer to communicate a defendant's cooperation to the prosecutor, absent other coercive conduct, is not objectionable.

### B.

{11} Sanders also asserts that the threat on his life induced his confession. However, the FBI did not originate the threat, but merely communicated it to Sanders. Accordingly, we must consider whether the mere communication of a threat made by a third person can constitute sufficient state coercion to render the resulting confession involuntary.

{12} Sanders relies on *State v. Foster,* 25 N.M. 361, 183 P. 397 (1919), and *State v. Benavidez,* 87 N.M. 223, 531 P.2d 957 (Ct. App.1975), for the proposition that the threat need not originate with the state actor. Neither *Foster* nor *Benavidez* can be read to support Sanders' contention. Neither *Foster* nor *Benavidez* concerned threats made by third persons and whether those threats could constitute police coercion. Instead, the issue in both *Foster* and *Benavidez* was whether the individual making a promise of leniency appeared to have the authority to make that promise, and whether the promise expressed by that person could constitute sufficient coercion to render the confession involuntary. *See Foster,* 25 N.M. at 364, 183 P. at 398; *Benavidez,* 87 N.M. at 226, 531 P.2d at 960. Both *Foster* and *Benavidez* dealt with promises of leniency, not threats, made by third parties. *Id.* As such, we conclude that neither *Foster* nor *Benavidez* support Sanders' claim.

{13} Despite Sanders' misguided citations to *Foster* and *Benavidez,* we have found some support for his contention in Federal jurisprudence. The United States Supreme Court indirectly addressed the issue of whether the threat need originate with government officials in *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). In *Payne,* the defendant was suspected in the brutal killing of a local businessman. 356 U.S. at 562–63, 78 S.Ct. 844. The defendant was arrested without a warrant and in addition to numerous other improprieties,[3] he was also told by the chief of police that there was an angry mob outside waiting for him. The Supreme Court found the communication of the mob threat particularly relevant, stating: "It seems obvious from the totality of this course of conduct, and particularly the culminating threat of mob violence, that the confession was coerced and did not constitute an 'expression of free choice.' " *Id.* at 567, 78 S.Ct. 844 (footnote and quoted authority omitted). Therefore, the Supreme Court held that the communication of that threat, combined with the other circumstances, was sufficient to hold the confession involuntary.

{14} The United States Supreme Court directly addressed the issue of whether the threats of violence need to originate from the government officials in *Arizona v. Fulminante.* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante* the defendant was incarcerated in a federal prison in New York. *Id.* at 282, 111 S.Ct. 1246. During his incarceration, he was receiving "tough treatment and whatnot" from the other inmates because of a rumor that he had killed his stepdaughter in Arizona. *Id.* at 283, 111 S.Ct. 1246. Another inmate and a paid informer for the FBI, offered protection from the other inmates if Fulminante told him about the murder in Arizona. Fulminante confessed, and that confession was used against him at his trial in Arizona for

---

**3.** The United States Supreme Court described the defendant and the circumstances of his confession as "a mentally dull 19–year–old youth [who], (1) was arrested without a warrant, (2) was denied a hearing before a magistrate at which he would have been advised of his right to remain silent and of his right to counsel, as required by Arkansas statutes, (3) was not advised of his right to remain silent or of his right to counsel, (4) was held incommunicado for three days, without counsel, advisor or friend, and though members of his family tried to see him they were turned away, and he was refused permission to make even one telephone call, (5) was denied food for long periods, and, finally, (6) was told by the chief of police 'that there would be 30 or 40 people there in a few minutes that wanted to get him,' which statement created such fear in petitioner as immediately produced the 'confession.' " *Payne,* 356 U.S. at 567, 78 S.Ct. 844.

the murder of his stepdaughter. *Id.* at 284, 111 S.Ct. 1246. In ruling that the confession was involuntary, the United States Supreme Court stated, "Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient." *Fulminante*, 499 U.S. at 287, 111 S.Ct. 1246 (footnote omitted). The Supreme Court found that the "credible threat" from the prison population, when combined with the offer of protection, was sufficient to overbear Fulminante's will and render his confession the product of official coercion. *See id.* Therefore, in *Fulminante* the United States Supreme Court found the confession coerced even where the state did not originate the threat, but merely capitalized on it to induce Fulminante's confession.

{15} Other courts have followed *Fulminante's* pronouncement that the communication of a credible threat is sufficient to operate as official coercion. *See United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir.1996) (finding a "credible threat" of violence from drug organization); *United States v. Heatley*, 994 F.Supp. 477, 483 (S.D.N.Y.1998) (recognizing that "a confession induced by a credible threat of physical violence to the suspect, combined with a government promise of protection conditioned upon the suspect's confession, can be considered involuntary"); *Haak v. State*, 695 N.E.2d 944, 948 (Ind.Sup.Ct. 1998) ("It was irrelevant whether the threat came from a government agent or a third party" but deciding that confession was not coerced); *State v. Carroll*, 138 N.H. 687, 645 A.2d 82, 86 (1994) ("Admittedly, some courts have found confessions involuntary in cases where state agents said they would not protect the defendant from a credible threat of imminent harm from a third person unless the defendant confessed.").

{16} Based on this precedent, we conclude that a finding of coercion need not depend upon actual violence by a government agent, and we follow the United States Supreme Court's determination that a credible threat of physical violence from a third party may be sufficient to render a confession involuntary. However, we hold that the communication of a credible threat of violence to a defendant is but one factor to be considered when conducting an examination into the totality of the circumstances surrounding the confession.

## C.

{17} In this case, based on the totality of the circumstances, we find that Special Agent Pittman communicated a credible threat to Sanders of violence from the drug organization. However, where the FBI made no offer of protection in exchange for Sanders' cooperation and all of the other circumstances support the voluntariness of the confession, we hold that Sanders' confession was voluntary and properly admitted by the district court.

{18} There is nothing in the record which indicates that Sanders did not fully understand what he was doing when he gave his confession. He is a middle-aged individual with a high school education. There is nothing in the record to suggest that his mental faculties were in any way impaired on the day he gave his confession. Sanders makes no showing that his depression rose to a debilitating level, such that he was unable to make an informed, knowing decision. *Cf. Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (citing *Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), for the proposition that as interrogators have turned to psychological persuasion, "courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus."). Although Sanders may have been depressed, this did not inhibit his ability to carry on with day-to-day activities or to hold down employment, as evidenced by his ability to fight the fire in June with no problems.

{19} We also can find no wrongdoing in the conduct of the FBI agents in this case. *See Connelly*, 479 U.S. at 167, 107 S.Ct. 515 (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' "); *see also State v. Fekete*, 120 N.M. 290, 299, 901 P.2d 708, 717 (1995) (adopting *Colorado v. Connelly* and holding the "totality of circumstances test includes an element of police overreaching"). Special Agent Pittman clearly

identified himself as a law enforcement officer both during his initial visit to the feed store and in all subsequent conversations with Sanders. Therefore, Special Agent Pittman's status and role were clearly known to Sanders. There is no allegation that the agents invented the threat on Sanders' life as a pretext for communication or otherwise used trickery or deceit. Special Agent Pittman did not make an offer of protection contingent on Sanders' confession. There was no quid pro quo in this case.

{20} We also find no wrongdoing on the part of the agents in offering to inform the U.S. Attorney of Sanders' cooperation. This is especially true considering that Special Agent Pittman clearly communicated to Sanders that he was unable to make any promises to Sanders, and Sanders responded that he "realized that."

{21} We find it significant that Sanders initiated the telephone conversation to which he now objects. He was under no obligation to return Special Agent Pittman's call, and he was free to terminate the conversation at any time. Furthermore, it is significant that during the initial conversation, it was Sanders who volunteered his cooperation by stating, "Okay, would it help you all in the investigation if I cooperated any at all?" Sanders was not taken into custody and the interview took place at a neutral location. Sanders was under no obligation to meet the officers at the Super 8 Motel. He was not picked up by the officers but was driven there by his father and girlfriend. *See e.g. Munoz*, 1998–NMSC–048, ¶¶ 28–32, 126 N.M. 535, 972 P.2d 847, (discussing coercive effect of atmosphere of the interview). There is also no allegation that Sanders was mistreated in any way.

{22} It is impossible for this Court to fully understand what convinced Sanders to cooperate with the FBI, but based on a totality of the circumstances, we do not believe that the officers coerced Sanders' confession. In this case, it appears that Sanders was motivated to cooperate for reasons that had nothing to do with any improper police conduct. Sanders stated during the initial conversation with Agent Pittman that, "this has been in the back of my head, bugging me

for probably a year." After reviewing the totality of the circumstances, we hold that Sanders' confession was voluntary and properly admitted in the district court.

### III.

{23} Sanders claims that the district court's failure to submit his proffered instructions regarding the voluntariness of his confession constitutes reversible error. However, we believe that the jury was properly instructed on the voluntariness of Sanders' confession. The jury was instructed regarding the admission of a confession according to UJI 14–5040 NMRA 2000:

> Evidence has been admitted concerning a statement allegedly made by Richard Sanders. Before you consider any such statement for any purpose, you must determine that the statement was given voluntarily. In determining whether a statement was voluntarily given, you should consider if it was freely made and not induced by promise or threat.

At Sanders' request, the jury also received an instruction that defined both "promise" and "threat." The instructions given in this case were not erroneous, vague, nor contradictory. *See State v. Parish*, 118 N.M. 39, 41–42, 878 P.2d 988, 990–91 (1994). The four other instructions proffered by Sanders regarding the voluntariness of the confession were cumulative and would have given undue emphasis to the Defendant's theory of the case. *See State v. Sparks*, 102 N.M. 317, 324, 694 P.2d 1382, 1389 (Ct.App.1985). We hold that the jury was properly instructed in this case.

### IV.

{24} Sanders alleges the trial court erred by denying his motion to monitor the jury culling process. The culling process is the stage in which the judge or designee disqualifies or exempts prospective jurors pursuant to the statutory exemptions contained in NMSA 1978, § 38–5–1 (1991) and NMSA 1978, § 38–5–11(B) (1991). A defendant's right to be present during this process was recently addressed by the New Mexico Court of Appeals in *State v. Huff*, 1998–

NMCA–075, 125 N.M. 254, 960 P.2d 342. We are persuaded by the Court of Appeals' reasoning in *Huff:*

> Defendant's presence would not impact the process. Defendant has no statutory authority to participate in this process, and, unlike the process of challenging potential jurors where Defendant may be able to discern some bias or prejudice, defendant can provide no special insight into the removal of jurors from the pool who are disqualified or excused on statutory grounds. *See* NMSA 1978, § 38–5–1 (1991).

*Id.* at ¶ 31; *see also* § 38–5–11(B) (setting forth the statutory exemptions available for prospective jurors.). The reasoning in *Huff* is particularly convincing when viewed with Section 38–5–11(C), which allows the inspection and copying of both the certified list and the questionnaires of the panel members. *See* § 38–5–11(C) ("The certified list of jurors and the questionnaires obtained from jurors shall be made available for inspection and copying by any party to any pending proceeding or their attorney or to any person having good cause for access to the list and the questionnaires."). Access to these records coupled with the ability to voir dire the potential jury members for his trial on the information contained therein is all that is statutorily required and all that we think is appropriate.

### V.

{25} We hold that the district judge properly denied the motion to suppress Sanders' confession and the motion to monitor the jury culling process. We also hold that the jury was properly instructed on the voluntariness of Sanders' confession. Therefore, we affirm.

{26} **IT IS SO ORDERED.**

MINZNER, C.J., FRANCHINI, SERNA, and MAES, JJ., concur.

13 P.3d 468