1997–NMSC–004

932 P.2d 484

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Bernadette SETSER, Defendant–
Appellant.**

No. 22983.

Supreme Court of New Mexico.

Dec. 23, 1996.

Liane E. Kerr, Albuquerque, for Defendant–Appellant.

Tom Udall, Attorney General and Margaret McLean, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

## OPINION

RANSOM, Justice.

1. Bernadette Setser appeals her conviction on two counts of first-degree murder, conspiracy to commit murder, aggravated robbery, unlawful taking of a motor vehicle, and tampering with evidence. *See* NMSA 1978, § 30–2–1(A) (Repl.Pamp.1994) (murder in the first degree); NMSA 1978, § 30–28–2 (Repl.Pamp.1994) (conspiracy); NMSA 1978, § 30–16–2 (Repl.Pamp.1994) (robbery); NMSA 1978, § 66–3–504 (Repl.Pamp.1994) (unlawful taking of a motor vehicle); NMSA 1978, § 30–22–5 (Repl.Pamp.1994) (tampering with evidence). Setser asserts that, because she lacked the capacity to waive her *Miranda* rights, the trial court erred in admitting her confession into evidence. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). She also asserts that, because the trial court admitted testimony of an accomplice not included on a witness list, the trial court denied her right of confrontation and that the court denied her right to allocution. For the reasons set out below, we affirm the trial court.

2. *Facts and proceedings.* Ed and Marie Brown were stabbed to death in their Rio Rancho home on February 4, 1994. Ed Brown received fifty-eight stab wounds to his head, upper body, and abdomen while he slept. Marie Brown was stabbed six times, with fatal wounds to her neck and thorax. It is believed that she was fatally stabbed from behind as she attempted to phone for help. The couple's granddaughter reported finding their bodies. Rio Rancho public safety officers investigating the crime scene discovered that the couple's automobile was missing, as well as Ed Brown's wallet. It was later learned that several credit cards also had been taken from Marie Brown's purse. Two knives were missing from a butcher block in the kitchen. A search of the bedroom of the Brown's grandson, Michael Brown, turned up a large collection of empty beer cans and an empty bottle of gin.

3. Having noticed gang graffiti inside and outside of the Brown residence, the police called the gang unit to the scene. One of the unit officers, Pete Montoya, went to the home of Kelly Fisk to find a friend of Michael Brown who might know where Brown was located. Officer Montoya arrived at the Fisk home at the same time as Officer Joe Garcia, who was looking for information on a juvenile runaway. Fisk informed the officers that Brown was in her bedroom. The officers walked past Setser in the hallway leading to the bedroom, and there found Brown and Jeremy Rose. Officers Montoya and Garcia began to question the two juveniles about the murders of Ed and Marie Brown.

4. Fisk's mother approached Officer Montoya and told him that there was a young woman in the kitchen who wished to confess something to him. Officer Montoya discovered Setser in the kitchen and escorted her to the garage. There he advised her of her

*Miranda* rights by reading the rights and asking her if she understood each right as it was read to her. Setser stated that she understood each right. She then waived her right to remain silent and adamantly refused to have either an attorney or her mother present for her statement. Setser confessed that she and Rose stabbed Ed and Marie Brown. She was then arrested. At the station house, Setser again was advised of her *Miranda* rights, waived them, and confessed to the murders.

5. Setser has a long history of emotional and mental problems. Evidence introduced at trial shows that Setser was diagnosed with hyperactivity and poor behavioral control at age five. Setser's expert on forensic and clinical psychology, Dr. Susan Cave, testified that Setser's mother had been an active alcoholic during her pregnancy, and that Setser displayed symptoms of fetal alcohol syndrome, including attention deficit disorder, hyperactivity, and severe academic problems. In addition, Setser was sexually molested by a family member as a child, and at the age of eleven she began to molest other neighborhood children. At age thirteen Setser was admitted to a psychiatric hospital because of molesting other children. There she was treated for depression and severe behavioral problems. She was then sent to a treatment facility for one year. She was released and began attending regular high school in the fall of 1993. She has admitted to abusing alcohol, marijuana, cocaine, and crack cocaine on a fairly regular basis.

6. Extensive testing of Setser before trial revealed other problems. Setser is described by Dr. Cave as being passive and easily dominated. She is filled with self-hatred, and willing to go to great extremes to get approval from others. Setser has difficulty saying "no" to others and suffers from depression and low self-esteem. One expert for the State testified that Setser had an average I.Q., but Dr. Cave suggested that Setser's I.Q. was probably around 77, a subnormal score that would place her near the borderline of mental retardation.

7. Setser filed a pretrial motion to suppress her two confessions. She argued that, because of her age and mental condition, she could not voluntarily waive her *Miranda* rights. At a preliminary hearing, Dr. Cave testified to Setser's various emotional and mental problems. Officers Montoya and Garcia testified about Setser's confessions and the circumstances surrounding the confessions. The trial court ruled that both statements were given intelligently, knowingly, and voluntarily. The court therefore denied the suppression motion.

█ 8. *Admissibility of confession.* Setser asserts that the admission of her confessions violated her rights under both the Fifth and Fourteenth Amendments. *See* U.S. Const. amends. V (self-incrimination), XIV (due process). Pursuant to these rights, it is the burden of the prosecution to prove by a preponderance of the evidence that a defendant's statement was given voluntarily. *Aguilar v. State*, 106 N.M. 798, 800, 751 P.2d 178, 180 (1988). On appeal, we review the totality of the circumstances to determine independently whether the prosecution has proved that a confession was given voluntarily. *Id.* at 799–800, 751 P.2d at 179–80; *see also Culombe v. Connecticut*, 367 U.S. 568, 606, 81 S.Ct. 1860, 1881, 6 L.Ed.2d 1037 (1961).

█ 9. Here, the confessions were properly admitted into evidence, and the jury was properly instructed to find whether the statements were given voluntarily, only if we determine as a threshold matter of law that the prosecution proved voluntariness by a preponderance of the evidence. *State v. Fekete*, 120 N.M. 290, 299, 901 P.2d 708, 717 (1995). Both the Fifth Amendment protection against self-incrimination and the Fourteenth Amendment right to due process negate admissibility of a confession elicited through intimidation, coercion, deception, assurances, or other police misconduct that constitutes overreaching. *Id.* at 298–302, 901 P.2d at 716–20. Furthermore, any waiver of the Fifth Amendment protection against self-incrimination must be knowing and intelligent regardless of police misconduct. *Id.* at 301–02, 901 P.2d at 719–20.

█ 10. *—No police misconduct.* The State asserts that the police officers did not engage in any misconduct in this case. Ap-

plying the totality-of-circumstances test, we agree. Setser, through Kelly's mother, initiated the contact with the police. When Officer Montoya entered the kitchen, Setser stated that she wished to speak to him in private and that she wished to confess. He read the *Miranda* warning to her, and asked if she understood each right as he explained it. He then asked if she wished to have an attorney or parent present, which she declined. She stated that she understood all of her rights and then waived them. Setser was not subjected to extensive police interrogation. In fact, the only time Officer Montoya spoke to her was to advise her of her rights. Setser was advised of her rights again at the police station, and she again waived them. There is no allegation that Setser was subjected to lengthy or abusive questioning by the police. She was neither promised special treatment nor threatened by the police. Based on these facts, we find no police misconduct in this case.

11. *—Waiver of right against self-incrimination by juvenile who is mentally and emotionally disabled.* Setser argues, however, that the absence of police misconduct is irrelevant to her case. There was no police misconduct in *Fekete* either, but evidence nonetheless was reviewed for support of the conclusion that, notwithstanding his mental disease, Fekete understood the meaning of his rights and the consequences of a waiver of those rights. 120 N.M. at 301, 901 P.2d at 719. Setser concedes that the conclusion reached in *Fekete* is appropriate for disabled adults, but she argues that such rationale is not applicable to her and that a different standard should apply to a sixteen-year-old juvenile who is mentally and emotionally disabled. The standard that she proposes would consider the mental and not the chronological age of a juvenile when determining ability to knowingly and intelligently waive constitutional rights.

12. By statute, there is a rebuttable presumption that confessions taken from juveniles under the age of fourteen are inadmissible. NMSA 1978, § 32A–2–14(F) (Repl. Pamp.1995). In *State v. Jonathan M.*, we held that the confession of a thirteen year old was inadmissible under the statute. 109

N.M. 789, 791, 791 P.2d 64, 66 (1990). Since Setser is sixteen, however, no such presumption applies. *See State v. Niewiadowski,* 120 N.M. 361, 366, 901 P.2d 779, 784 (Ct.App.) (holding that the confession of a fifteen-year-old criminal defendant was admissible, even though his father, who was present at the confession, adequately understood neither the English language nor the constitutional rights explained to his son), *cert. denied,* 120 N.M. 184, 899 P.2d 1138 (1995).

13. Although the statute does not create a presumption regarding the admissibility of a sixteen year old's confession, it provides guidelines for determining if a juvenile waived constitutionally-protected rights. The Children's Code says, in pertinent part:

In determining whether the child knowingly, intelligently and voluntarily waived the child's rights, the court shall consider the following factors:

(1) the age and education of the respondent;

(2) whether or not the respondent is in custody;

(3) the manner in which the respondent was advised of his rights;

(4) the length of questioning and circumstances under which the respondent was questioned;

(5) the condition of the quarters where the respondent was being kept at the time he was questioned;

(6) the time of day and the treatment of the respondent at the time that he was questioned;

(7) *the mental and physical condition of the respondent at the time that he was questioned;* and

(8) whether or not the respondent had the counsel of an attorney, friends or relatives at the time of being questioned.

Section 32A–2–14(E) (emphasis added). This list is essentially a codification of the totality-of-circumstances test.

14. The trial court determined that Setser's confession was given voluntarily under either the statutory or the totality-of-circumstances standard, and we agree. Although there is testimony that Setser suffers from certain conditions and disorders that

affect her cognitive abilities, there is no evidence that she lacks sufficient intelligence to understand her rights and the repercussion of waiving those rights. We hold that Setser's confession was given voluntarily after a valid waiver of her *Miranda* rights and therefore affirm the trial court.

■ 15. Setser also argues that it is unfair and arbitrary to exclude the confession of a thirteen-year-old juvenile while not excluding the testimony of a sixteen-year-old juvenile who is mentally younger. *See* § 32A–2–14(F) (rebuttable presumption that confession of thirteen year old is inadmissible). She maintains that this provision is unconstitutional as applied to her. We review under the rational-basis standard this rebuttable presumption that the statements and confessions of a juvenile under the age of thirteen are inadmissible. *See Marrujo v. New Mexico Highway Transp. Dep't*, 118 N.M. 753, 757, 887 P.2d 747, 751 (1994) (applying rational-basis standard to those interests "that are not fundamental rights, suspect classifications, important individual interests, and sensitive classifications"). This is the appropriate standard because the age classification in Section 32A–2–14(F) does not adversely impact a fundamental right, nor does it create a suspect classification. "In applying the rational basis test, we do not question social or economic policy underlying the statute." *Coleman v. United Eng'rs & Constructors, Inc.*, 118 N.M. 47, 51, 878 P.2d 996, 1000 (1994). The legislature's purpose in enacting Section 32A–2–14(F) is to provide extra protection for the very young. Advancing this goal requires drawing a line and drawing it at age thirteen is rationally related to the legislature's purpose. Therefore, we find Section 32A–2–14(F) constitutional.

■ 16. *Right of confrontation.* Setser argues that she was denied her constitutional right to confrontation because the State did not inform her of a plea agreement with Jeremy Rose until a few days before trial. "The Confrontation Clause of the Sixth Amendment to the United States Constitution and Article II, Section 14, of the New Mexico Constitution guarantee a defendant in a criminal prosecution the right to confront the witnesses against him." *State v. Sanders*, 117 N.M. 452, 459, 872 P.2d 870, 877 (1994). The most important element of this right is the right to cross-examination. *In re Troy P.*, 114 N.M. 525, 529, 842 P.2d 742, 746 (Ct.App.1992). Setser describes the prosecutor's action as evincing a hidden agenda, and an example of "trial by ambush" that adversely affected her ability to cross-examine Rose. The State asserts that it acted properly and advised Setser of Rose's testimony promptly.

17. On December 9, 1994, approximately ten months after the murders and one month before Setser's trial, Jeremy Rose gave a statement to the prosecution. Rose's attorney was present, and counsel for both sides understood that the statement was made for the purpose of a possible plea agreement. A plea agreement was filed on January 6, 1995, and the statement was disclosed to Setser on the same day. Trial began on January 9, and Setser had the opportunity to interview Rose on January 11. Rose was called as a witness by the State on January 12, and Setser immediately objected to the introduction of his statement and his testimony at trial. She asserts that she should have been notified of Rose's statement immediately, and that failing to include Rose on witness lists prevented her from conducting a sufficient background check necessary for effective cross-examination.

18. A party to a criminal action must notify other parties when the former becomes aware of "additional materials or witnesses which he would have been under a duty to produce or disclose" under Rules 5–501 and 5–502. *See* Rule 5–505(A) NMRA 1996. There is, however, an exception to this rule.

> Evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.

Rule 11–410 NMRA 1996. The State argues that Rose's statements were undiscoverable

because they were made in negotiations of a plea agreement. While it is true that the statement may not have been *admissible* against *Rose* at his trial, this does not mean that the State did not have a responsibility to provide Setser with the statement. There is nothing in Rule 410, or the cases interpreting it, that renders such statements undiscoverable in relation to another's trial. The State had a responsibility to provide Setser with Rose's statement, and it failed to do so for almost one month. The determinative question then is whether Setser was prejudiced by the State's failure. *See State v. Griffin,* 108 N.M. 55, 58, 766 P.2d 315, 318 (Ct.App. 1988) (holding that the "[f]ailure to disclose a witness' identity prior to trial in itself is not grounds for reversal" and that "[t]he objecting party must show that he was prejudiced by such non-disclosure").

19. Setser has alleged that knowing Rose would testify would have been "critical" to her case, and that she was prejudiced by her inability to prepare sufficiently for cross-examination. A mere assertion of prejudice is not, however, a showing of prejudice. *State v. Ernesto M.,* 121 N.M. 562, 915 P.2d 318 (Ct.App.), *cert. denied,* 121 N.M. 444, 913 P.2d 251 (1996). Setser had an opportunity to review Rose's statement at length. She was able to interview Rose before he testified, and she was able to conduct an extensive cross-examination. Also, Setser did not show that there was any evidence discovered post-trial that she was unable to present at trial because of the State's actions. We cannot say that Setser was unfairly prejudiced by Rose's testimony. Therefore, the trial court is affirmed.

■ 20. *Right of allocution.* Setser's final argument is that she was denied her right to allocution when the trial court refused to grant a continuance for sentencing until Setser's psychologist could testify. Setser wished to have Dr. Cave testify at her sentencing hearing, but Dr. Cave was out of the state on business during the hearing. Allocution is defined as "the formal inquiry or demand made by the court or clerk to accused at the time for pronouncing sentence as to whether accused has anything to say why sentence should not be pronounced on him." 3A C.J.S. *Allocution* (1973). In New Mexico, this common-law doctrine has been extended to non-capital felonies. NMSA 1978, § 31–18–15.1 (Repl.Pamp.1994). This means that, at least in cases involving felony convictions, "the trial judge must give the defendant an opportunity to speak *before* he pronounces sentence. Failure to do so renders the sentence invalid." *Tomlinson v. State,* 98 N.M. 213, 215, 647 P.2d 415, 417 (1982) (emphasis added). "Allocution is a peculiar right. In a sense, it is the right to be advised of another right." *State v. Ricky G.,* 110 N.M. 646, 650, 798 P.2d 596, 600 (Ct.App.1990) (Hartz, J., specially concurring).[1]

21. Setser exercised her right to address the court at the time of sentencing. The right of allocution embodies no right to demand a continuance so that an expert may testify. The court did give Setser the opportunity to make a proffer as to the expert's testimony, which she did. Setser did not allege that the testimony of her expert at sentencing would be substantially different from the testimony of the same expert at trial. The trial court provided sufficient protection of Setser's right to allocution, and we therefore affirm on this issue.

22. *Conclusion.* We hold that a juvenile, even one with disabilities, can make a knowing and intelligent waiver of constitutional rights, and that the State proved that the waiver by Setser was knowing and intelligent. We also hold that Setser was not denied her right to confrontation, nor was she denied her right to allocution. Therefore, her conviction is affirmed.

23. **IT IS SO ORDERED.**

BACA, C.J., and FRANCHINI, J., concur.

---

1. The right developed at a time when the criminal defendant had no right to counsel and no right to testify. Allocution was created so that a defendant would be aware of the single situation in which he could address the court. W. LaFave & J. Israel, *Criminal Procedure* § 25.1(f), at 118 (1984). Although this is no longer the case, the right of allocution has remained a part of the common law.