This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

v.                                                          **NO. 32,180**

**JOHN GAMBLE,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF EDDY COUNTY**
**JANE SHULER GRAY, District Judge**

Gary King, Attorney General
William Lazar, Assistant Attorney General
Santa Fe, NM

for Appellee

Law Offices of Nancy L Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

**DECISION**

**SERNA, Justice.**

{1}     Defendant John Gamble (Child), a sixteen-year-old, confessed to killing fifteen-year-old Joseph Garcia (Victim) near Carlsbad, New Mexico. Child was charged as a serious youthful offender and convicted by jury of first-degree murder, first-degree kidnapping, and bribery of a witness. Prior to trial, Child pleaded guilty to one count of tampering with evidence. Child was sentenced to a total term of 60 years imprisonment.

{2}     Child appeals his convictions to this Court pursuant to Rule 12-102(A)(1) NMRA and Article VI, Section 2 of the New Mexico Constitution, which allow for the direct appeal of a conviction resulting in a sentence of life imprisonment. He raises the following issues: (1) whether the trial court erred in denying Child's motion to suppress his confession as well as (2) his motion for a change of venue; (3) whether there was sufficient evidence of premeditation to support the first-degree murder conviction; (4) whether the trial court's admonishment of Child's counsel for untimely filings and the subsequent "threats of sanctions" warrant a new trial; and (5) whether cumulative error warrants a new trial. For the reasons stated below, we affirm Child's convictions.

# I. BACKGROUND

{3} Not long before Victim's death, Child and Victim broke into a local school together. Victim was caught outside of the school, and Child believed that Victim had "ratted" him out when he was questioned about the incident. The two had been close friends before the burglary, but Child's feeling of betrayal and belief that "[f]riends don't rat on other friends" soured the friendship.

{4} Roughly two weeks after the burglary, on October 12, 2008, Victim's body was discovered off of a dirt road outside of Carlsbad. Child quickly became a suspect, and a warrant was obtained to search his home. During the search, officers seized several items from Child's room implicating him in the murder and learned that Child had not been home for a couple of days—a violation of his conditions of probation for an unrelated incident. Child's probation officer subsequently obtained a warrant for his arrest on the probation violation. While at the police station after his arrest, Child was questioned about Victim's death and ultimately confessed to Victim's murder.

{5} Child provided the following account of the night of Victim's death during his confession and his subsequent trial testimony. The night of Victim's death, Child received a ride from a friend to a party. He had also arranged to borrow the

3

same friend's car later that evening in order to pick up another friend.  Although he had originally planned to pick up someone else, Child ultimately called Victim and asked him to go to the party.

{6}    When his friend first picked him up that evening to go to the party, Child placed a two-gallon gas can and a rifle wrapped in a sweatshirt into the trunk of the car.  Child brought the gas because he had promised his friend he would put gas in the car, and did so after arriving at the party.  Child brought the rifle because he had been jumped earlier that year, and as a result would typically bring a weapon to gatherings just in case he ended up needing one.

{7}    After inviting Victim to the party, Child left the party and met Victim at a nearby church in order to pick him up.  Victim did not live far from the location of the party, but agreed to meet Child at a nearby church anyway.  After picking Victim up and stopping at a gas station to say hello to a friend, Child, instead of returning to the party, drove to a secluded area outside of town where local youth would regularly go to drink and do drugs.  Child and Victim sat on the hood of the car to smoke marijuana, and Child confronted Victim about the burglary incident.  Child asked Victim why he had "ratted."  Victim denied that he had given the officers Child's name, and a fight ensued between the two.

{8} At some point after the fighting began, Child knocked Victim to the ground. While on the ground, Child continued to punch Victim and knee him in the head. Child then retrieved the rifle from the car and hit Victim on the head with the rifle. He "panicked" after Victim stopped moving, and then retrieved the remaining gasoline from the car. Child then proceeded to pour gasoline on Victim's body and set it on fire. Child had also tried to shoot Victim after hitting him with the rifle and before lighting him on fire, but he could not get the gun to fire. Child then returned to the party. Friends at the party noticed that upon his return Child had visible scrapes and other minor injuries, and Child said he had been in a fight with Victim. Further factual development will be provided as necessary for the legal analysis below.

## II. DISCUSSION

### A. Child Knowingly, Voluntarily, and Intelligently Waived His *Miranda* Rights

{9} Lieutenant Bryan Burns, the officer who arrested Child and conducted the subsequent interview leading to Child's confession, testified at the suppression hearing that when he arrived at Child's home to execute the arrest warrant, Child was sitting out front with his father. Lt. Burns informed both Child and his father that he needed to speak with Child about what had happened during the prior

5

weekend. Child's father asked if he needed to be present for questioning, to which Lt. Burns replied that Child was sixteen and it was up to him whether or not to have anyone present. Child's father said he would likely stop by the police station after a while.

{10}   At the station, Lt. Burns took Child into an interview room and reviewed a form with Child used by the Carlsbad Police Department to advise juvenile suspects of their *Miranda* rights. The form listed the following information and provided a space for initials after each statement:

Before we ask you any questions you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to call your parent(s), guardian, or custodian[.]

You have the right to have your parent, guardian or custodian or a lawyer present during any questioning.

You have the right to call a lawyer and if you cannot afford a lawyer, one will be appointed for you before any question if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering questions at anytime [sic]. You also have the right to stop answering questions at anytime [sic] until you talk to a lawyer.

I have [r]ead my rights and understand what my rights are.

6

Lt. Burns went over each statement slowly with Child, and Child initialed each statement on the form, never asking to have his father or anyone else present. Child also signed an additional statement, which Lt. Burns read and explained to Child, acknowledging that he understood what he was doing by waiving his rights and that he had not been threatened or coerced in order to do so. After Child signed the form and acknowledgment, Lt. Burns told the Child that he wanted to speak with Child about something other than the probation violation, and confirmed with Child the understanding that they were speaking about what happened to Victim. Child then proceeded to confess to Victim's murder.

{11}    Child moved to suppress his confession on the grounds that (1) he was in police custody under the pretext of an arrest for a probation violation; (2) his father was not present during the interview; and (3) he was high on drugs when questioned by Lt. Burns. When reviewing a trial court's denial of a motion to suppress a defendant's statements, "we accept the factual findings of the district court unless they are clearly erroneous, and view the evidence in the light most favorable to the district court's ruling." *State v. Martinez*, 1999-NMSC-018, ¶ 15, 127 N.M. 207, 979 P.2d 718 (quoting *United States v. Toro–Pelaez*, 107 F.3d 819, 826 (10th Cir.1997)). We review de novo, however, the ultimate legal

determination that a defendant made a knowing, voluntary, and intelligent waiver of his *Miranda* rights. *Martinez*, 1999-NMSC-018, ¶ 15.

{12} As with adults, when determining whether a child has made a knowing, voluntary, and intelligent waiver of *Miranda* rights, this Court assesses the totality of the circumstances surrounding the waiver. *Id.* ¶ 18. In analyzing the totality of the circumstances, we bear in mind that the waiver inquiry has two dimensions. *See State v. Gutierrez*, 2011-NMSC-024, ¶ 9, 150 N.M. 232, 258 P.3d 1024. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

{13} The New Mexico Legislature has codified the relevant factors in assessing the totality of the circumstances in juvenile waiver cases. *See State v. Setser*, 1997-NMSC-004, ¶ 13, 122 N.M. 794, 932 P.2d 484 (identifying that no rebuttable presumption exists regarding the admissibility of a sixteen-year-olds confession). The eight totality of the circumstances factors are: (1) the age and education of the child; (2) whether the child was in custody; (3) the manner in which the child was

8

advised of his or her rights; (4) the circumstances under which the child was questioned, including the length of time of the questioning; (5) the condition of the location where the questioning occurred; (6) the time of day and treatment of the child during questioning; (7) the mental and physical condition of the child during questioning; and (8) whether the child had the counsel of an attorney, friends, or relatives during the questioning. NMSA 1978, § 32A-2-14(E) (2009).

{14} Child's argument against making a knowing, voluntary, and intelligent waiver of his rights focuses on factors seven and eight of Section 32A-2-14(E), which concern the physical and mental condition of the child during questioning, and whether the child had the counsel of an attorney, friends, or relatives during the questioning, respectively. We discuss each contention separately below.

**1.      Child's Mental and Physical Condition During Questioning**

{15}      Child claims that before Lt. Burns arrested him and took him to the station, he had taken Seroquel, a drug commonly used to treat insomnia and depression, which "render[ed] both his mental and physical conditions suspect at best." In the trial court's order denying the motion to suppress, the court as part of its findings noted that Child stated under oath in front of the jury that he was not impaired during questioning. Child specifically testified during trial that the medication had

9

no effect on him that day. In addition, after having reviewed Child's taped confession during the suppression hearing, the court made the oral finding that Child appeared perfectly alert and normal, and further expressed concern regarding the credibility of Child's claim that he had taken any drugs before the confession.

{16}     This Court has held that, in assessing a child's cognitive abilities, when there "is no evidence that [a child] lacks sufficient intelligence to understand her rights and the repercussion of waiving those rights," the child makes a knowing and voluntary waiver. *Setser*, 1997-NMSC-004, ¶ 14 (holding that a sixteen-year-old with cognitive disabilities made a knowing and voluntary waiver); *see also Gutierrez*, 2011-NMSC-024 ¶¶ 15-16 (holding that sixteen-year-old native Spanish-speaking child with ADHD possessed sufficient intelligence to waive his rights when no evidence was presented to support a lack of sufficient intelligence to have understood his rights and the consequences of a waiver).

{17}     We conclude that although Child claims to have taken the medication before his confession, he openly admitted the drug had no effect on him, the trial court reviewed the confession and found Child's behavior to be normal, and there is no evidence in the record to suggest that he lacked sufficient intelligence to understand his rights and the repercussions of waiving those rights.

## 2. Allegations of Pretext and the Absence of Counsel, Friends, and Relatives During Questioning

{18} Lt. Burns testified that when he arrested Child for the probation violation, he told Child's father that he needed to talk to Child "about what had happened over the weekend." Lt. Burns told Child's father that he did not need to be present, but that his son could ask for him to be there. Before any questioning occurred at the station, Child was advised that he could request for his father to be present, he could request an attorney, and he could stop the questioning at any time. Child, being advised of these rights, did not request for anyone to be present and proceeded to initial the form indicating he understood his waiver.

{19} The trial court, as noted in its order denying the suppression motion, found that the Child was sixteen, did not need a parent present, and was not coerced into waiving his rights. *See State v. Jonathan M.*, 109 N.M. 789, 791, 791 P.2d 64, 66 (1990) ("[A] child over age fifteen is unlikely to make an involuntary statement in a noncustodial, noncoercive atmosphere or after receiving *Miranda* warnings."). During the suppression hearing, the court noted in its oral findings that the evidence presented did not suggest that there was any trickery involved when Child was arrested; he knew why he was there and what the questioning would be about. The trial court also noted that Child and his parents were aware that Victim had

11

been missing since the prior weekend, that Victim's mother had come to their house looking for Victim, and that Child's father testified that he figured his son would be questioned about the murder and was aware that a search warrant had been executed for Child's room in connection to Victim's disappearance.

{20}     In *Martinez*, we held a seventeen-year-old's waiver of rights to be knowing, voluntary, and intelligent where officers took the juvenile defendant into custody to question him concerning a murder, but told his mother that he needed to be questioned about a shoplifting incident. 1999-NMSC-018, ¶¶ 3, 12. As officers drove the juvenile to the police station, they informed him of their actual intent to ask him questions that did not concern the shoplifting incident. *Id.* ¶ 13. *Martinez* held that a juvenile's parents need not be notified of the custodial interrogation of their child, that there is no due process guarantee for such notification, and that although certainly relevant to the analysis, such lack of notification is only one factor of many to be considered in the totality of the circumstances analysis. *Id.* ¶ 20. In analyzing the other factors surrounding the confession, *Martinez* noted that while the officers misled his mother, the misinformation did not have the effect of tricking the juvenile into confessing because after being advised of his rights, the officers immediately informed the juvenile of why they were questioning him. *Id.*

¶ 24. Additional considerations we noted in holding the confession to be valid were the juvenile's age (seventeen-and-a-half), the interview only lasting about an hour, and the interview occurring at a time when the juvenile could be expected to be alert. *Id.* ¶ 22-23.

{21} In the present case, Lt. Burns specifically told both Child and his father that he wanted to talk to Child about the prior weekend. After thoroughly reviewing Child's rights with him at the station, Lt. Burns clarified the understanding that he wanted to talk to Child about Victim's death. Child admitted that he was not surprised when Lt. Burns asked him about Victim's death. In considering other factors surrounding the confession below, the trial court found that although Child was handcuffed to the chair initially, the conditions in the interrogation room appeared comfortable. Lt. Burns additionally testified that Child was questioned for less than an hour in a room that did not have locks on the doors, and contained a large table with chairs. The court also found that Lt. Burns reviewed the *Miranda* rights clearly, and that Child read the rights on his own and signed the form.

{22} We additionally note that English is Child's primary language, he could read and write, the questioning occurred at around three o'clock in the afternoon, and

Child admitted that the interviewing officer, Lt. Burns, was polite and did not threaten him or make any promises. Considering the totality of the circumstances, we hold that Child knowingly, intelligently, and voluntarily waived his *Miranda* rights.

**B.      The Trial Court Did Not Abuse Its Discretion in Denying Child's Motion for a Change of Venue**

{23}      This Court reviews a trial court's change of venue decision "keeping in mind that its 'discretion in this matter is broad and will not be disturbed on appeal unless a clear abuse of that discretion can be demonstrated.'" *Gutierrez*, 2011-NMSC-024, ¶ 39 (quoting *State v. House*, 1999-NMSC-014, ¶ 31, 127 N.M. 151, 978 P.2d 967). We also bear in mind that under this level of review "the question for this Court is whether the trial court abused its discretion by denying Defendant's motion to change venue, not whether Defendant presented substantial evidence regarding prejudice to the trial court." *State v. Barrera*, 2001-NMSC-014, ¶ 14, 130 N.M. 227, 22 P.3d 1177. A party requesting a change of venue must show "a reasonable probability that a fair trial cannot be obtained in a particular venue." *House*, 1999-NMSC-014, ¶ 57.

{24}      Two types of prejudice are considered in determining whether or not a change of venue is warranted: presumed prejudice and actual prejudice. *See id.* ¶

14

46. Presumed prejudice "addresses the effect of publicity about a crime upon the entire community," and a change of venue is necessary when "evidence shows that the community is so saturated with inflammatory publicity about the crime that it must be presumed that the trial proceedings are tainted." *Id.* Non-exclusive factors to consider in looking for presumed prejudice are (a) the neutrality and timing of the publicity, (b) the type and form of the publicity, (c) the size and nature of the community, (d) demonstrated actual prejudice by potential jurors, and (e) statements made about the case by politicians. *Id.* ¶¶ 59-72. When a trial court does not find presumed prejudice, however, and proceeds with voir dire, this Court will limit review only to evidence of actual prejudice. *See Gutierrez*, 2011-NMSC-024, ¶ 43. "Actual prejudice requires a direct investigation into the attitudes of potential jurors. . . . to establish whether there is such widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible." *House*, 1999-NMSC-014, ¶ 46.

{25} In support of his motion for change of venue, Child submitted a packet of several articles from the local newspapers, as well as online reader comments posted in response to the articles, that he argued demonstrated that the case had received considerable media attention and compromised his chances of being tried

15

before an impartial jury.

{26}     The trial court, in its written order denying the motion for change of venue, found that the publicity did not rise to the level necessary for a finding of presumed prejudice.  During the motions hearing, the court noted in its oral findings that, of the publications submitted, the majority were remote in time as they were published over a year before the trial setting, and none were unduly inflammatory. The court also noted that the "community" for purposes of the jury pool would include not only Carlsbad, where both Child and Victim resided, but also the separate city of Artesia, New Mexico.

{27}     The court also found that at Child's trial on another charge held less than two weeks before the hearing on the motion to change venue in the present case, the voir dire of the jury panel revealed that of the four people who knew of Child, three knew him personally through their children or other family connections, and one was an on-call responder to the crime scene.  The court also found that of that pool of prospective jurors, "nearly all" were unable to remember any details of the murder or the relation of Child to the murder.

{28}     Although this Court has in the past cautioned against the use of general personal experience and impressions of a community in determining whether or

16

not a successful showing has been made for change of venue purposes, here the observations were in addition to the court's findings related to the evidence presented regarding actual media attention, and the observations made regarding the voir dire were specific examples of actual community commentary on the upcoming trial and Child's connection to the murder that the judge experienced while presiding over the trial. *See House*, 1999-NMSC-014, ¶ 69 (admonishing against the use of a trial judge's own general impressions and understanding of local conditions and the community's citizens in determining that the defendant made an insufficient showing of presumed prejudice but determining "this indiscretion [to be] inconsequential").

{29} Finding no presumed prejudice, the trial court noted that it would allow ample time for thorough questioning during voir dire, and that Child's counsel was encouraged to carefully assess the jury pool and identify actual prejudice at that time. When the case went to trial, the greater part of a day was dedicated to extensive questioning concerning the case's publicity in order to determine whether actual prejudice existed. This process included counsels' questioning of individual prospective jurors who said that they read newspapers or were otherwise affected by the facts of the case. The court in its order denying the motion for

17

change of venue found that "there was extensive and rigorous questioning of prospective jurors" during voir dire regarding their reading of local newspapers and exposure to internet commentary on the case, and that the jurors selected were not affected by media attention in this case.

{30}     The extensive discussion and questioning during voir dire assured Child an impartial jury, and Child does not further articulate how the ultimate seating of the jurors resulted in actual prejudice.  *See Gutierrez*, 2011-NMSC-024, ¶ 47 (affirming denial of motion to change venue when "Child . . . offered neither evidence nor testimony to prove that any of the jurors who tried the case were actually prejudiced in any way . . . .").  Child fails to demonstrate an abuse of discretion on the part of the trial court in empaneling the jury for his trial.

**C.     The Evidence Was Sufficient to Support a Finding of Deliberate Intent**

{31}     In determining whether sufficient evidence exists to support a conviction for premeditated murder, we look to "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction."  *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (quoting *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515).  This Court will affirm the

18

conviction if, in viewing the evidence in the light most favorable to the verdict, any rational jury could have found beyond a reasonable doubt evidence supporting each element of the crime charged. *Riley*, 2010-NMSC-005, ¶ 12.

**{32}** First-degree murder consists of the "willful, deliberate and premeditated killing" of another person. NMSA 1978, § 30-2-1(A)(1) (1994). "Deliberate intention" is that "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." *State v. Flores*, 2010-NMSC-002, ¶ 19, 147 N.M. 542, 226 P.3d 641 (quoting *State v. Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176). Circumstantial evidence alone can support a finding of deliberation. *See Cunningham*, 2000-NMSC-009, ¶ 29; *see also State v. Duran*, 2006-NMSC-035, ¶ 7 ("Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." (quoting *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32)). "Deliberate intent may [also] be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence." *Duran*, 2006-NMSC-035, ¶ 8.

**{33}** Child argues that the evidence presented against him by the State to show premeditation is equally consistent with his assertion that he meant to confront

19

Victim, maybe even beat him up, but never planned to kill him. Child looks to *State v. Garcia*, 114 N.M. 269, 837 P.2d 862 (1992) as support for his argument that because the evidence presented in this case equally supports Child's version of the events it cannot support a jury finding of premeditation. However, the facts presented to the jury in *Garcia*, unlike the facts presented in this case, were held by this Court to be altogether insufficient to support a reasonable jury's finding of premeditation and deliberation. *Id.* at 274-75, 837 P.2d at 867-68.

{34} The possibility that other inferences could be made from the presented evidence does not require this Court to reverse when sufficient evidence was presented for a reasonable jury to conclude beyond a reasonable doubt that Child's actions satisfied the elements of first-degree murder. *See Riley*, 2010-NMSC-005, ¶ 12 ("[C]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject the defendant's version of the facts. Nor will this Court evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." (internal quotation marks, citation, and alterations omitted)).

{35} In *Riley*, we held that sufficient evidence to convict the defendant of first-degree murder was presented to the jury when such evidence included testimony

regarding the defendant's actions in the days leading up to the killing, the defendant's actions immediately before the killing, and the physical evidence recovered from the victim's body. *Id.* ¶ 21. The State in *Riley* presented evidence that the defendant was upset about his recent break up and his ex-girlfriend's relationship with the victim. *Id.* ¶ 19. The defendant had also mentioned the victim "in a threatening tone" in a letter he wrote to his ex-girlfriend prior to the murder, and the defendant and victim had been fighting about the ex-girlfriend immediately before the shooting occurred. *Id.* Before the defendant in *Riley* shot the victim, he ran into his house and came out with a gun. *Id.* ¶ 5. The defendant ran at the victim repeating "I'll kill you" and firing the gun at the victim. *Id.* Physical evidence showed that the first shots were fired from over thirty-eight feet away, and the final shots were fired from less than four inches away. *Id.* ¶ 20. This continuous shooting from varying distances after the defendant went inside to retrieve the gun further supported a finding of deliberate intent. *Id.*

{36} In this case, evidence of Child's actions leading up to Victim's death, combined with the physical evidence presented, support the jury's finding of deliberate intent. Child admitted during his confession that he had been angry with Victim since the burglary because "[f]riends don't rat on other friends," and Child

21

further indicated that he may have talked to someone at school about his intentions to confront and harm victim. A friend testified at trial that prior to Victim's death Child was still upset with Victim for snitching. The night of the murder, Child arranged to borrow a friend's car, and brought along a rifle wrapped in a sweatshirt and a can of gasoline. Child arranged to pick Victim up at a location away from his home and then drove him to a remote location outside of Carlsbad. Child then beat Victim until he was on the ground, and continued to beat him as he lay on the ground defenseless. Child then returned to the car to get the rifle. Physical evidence presented at trial indicates that Victim endured at least a half a dozen blows to the head with a sharp-edged manufactured object. Child also confessed to trying to shoot Victim after hitting him with the rifle, and evidence was presented that blood and hair was found around the action of the rifle. Victim's skull and jaw were severely fractured and Victim's brain was bruised and swollen, indicating he was unconscious for some time before he died. Physical evidence was also presented that Victim may have contracted early-stage pneumonia, indicating that Victim had been breathing for an hour or two before he died. After beating Victim with the rifle and attempting to shoot him, Child returned to the car to get the can of gasoline. Physical evidence suggests that Victim was set on fire one to two

hours after the beating began, likely after he had already died. *See State v. Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (noting that evidence from medical investigator that fatal strangulation would take at least several minutes, combined with evidence of motive, supported first-degree murder conviction). On the basis of this evidence, a rational jury could find sufficient evidence to support the elements of first-degree murder. We therefore affirm Child's first-degree murder conviction.

**D.    The Trial Court's Threats of Sanctions Against Defense Counsel Did Not Violate Child's Due Process Rights or the Right to Effective Assistance of Counsel**

{37}    Child argues that the trial court's admonition of counsel after missing filing and disclosure deadlines, in addition to the court's advisement that such failures would potentially lead to attorney sanctions, warrants a new trial. Child contends that the threat of sanctions led to a chilling effect on counsel's ability to raise issues in good faith due to timeliness concerns. Child does not advance any argument on this issue, such as discussing motions that should have been filed and were not, nor does he point to any prejudice suffered as a result of the threat of sanctions. As no plausible argument has been advanced on this point, we will not review the issue. *See State v. Clifford*, 117 N.M. 508, 513, 873 P.2d 254, 259

(1994) ("When a criminal conviction is being challenged, counsel should properly present this court with the issues, arguments, and proper authority.")

## III.    CONCLUSION

{38}    Because the findings of the lower court and jury challenged here did not result in error, Child's cumulative error claim is rejected. *See State v. Salas*, 2010-NMSC-028, ¶ 40, 148 N.M. 313, 236 P.3d 32. For the reasons stated herein, we affirm Child's convictions.

{39}    **IT IS SO ORDERED.**


_____
**PATRICIO M. SERNA, Justice**

**WE CONCUR:**


_____
**CHARLES W. DANIELS, Chief Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**